287 P.2d 221

**G. R. SPENCER, Plaintiff-Appellee,**

**v.**

**John H. BLISS, State Engineer, Defendant-Appellant.**

**No. 5911.**

Supreme Court of New Mexico.

July 29, 1955.

low (appellee here) to change the place or method of use of water from one location to another within the Carlsbad Underground Water Basin.

There were, in fact, two applications, described as Nos. C–223 and C–224. The applications were first filed with the State Engineer, both of which were denied, whereupon the plaintiff appealed from the decision to the district court of Eddy County. The two applications were separately docketed in the district court, but the applicant in both cases being the same and the lands in both the move-from area to the move-to area in each application being a part of the same farm, the appeals were by all parties and the court treated as consolidated for purposes of trial in such court. After hearing in the district court the decision containing the trial court's findings of fact and conclusions of law was duly made and filed. Judgment in conformity therewith having been entered this appeal followed. The findings and conclusions will be summarized.

Two wells in the Carlsbad Underground Water Basin are involved, the first of which was drilled in 1944 to a depth of 300 feet. The plaintiff caused the well to be equipped with pump and thereafter applied water from the well to beneficial use on lands adjacent to it. The capacity of the well was 400 gallons of water per minute, all of which was applied to beneficial use

Richard H. Robinson, Atty. Gen., Charles D. Harris, Sp. Asst. Atty. Gen., for appellant.

Stagner & Sage, Carlsbad, for appellee.

SADLER, Justice.

The State Engineer appeals from a judgment of the district court of Eddy County granting an application of the plaintiff be-

upon the land. This well is identified in the case as Declaration C–223.

In 1947, the plaintiff drilled another well at a location on a certain described 40 acres of land in section 25, township 22 south, range 26 east, N.M.P.M., being in the same section, township and range, as first well. It likewise was equipped with a pump and water applied therefrom to beneficial use on land adjacent thereto. Its capacity was the same as the first well, to wit, 400 gallons per minute, all of which was applied by plaintiff to beneficial use upon said lands.

Following the drilling of the two wells mentioned, the plaintiff filed with the State Engineer declarations of ownership of underground water rights with respect to each of the wells, the first of which was described as C-223 and the second as C-224.

Both wells were drilled prior to the establishment of Carlsbad Underground Water Basin, at a time when no permit was required from State Engineer for the drilling of same, or the appropriation of the waters derived therefrom, the lands of the plaintiff being then located outside any established or declared underground water basin.

At the time these wells were drilled they were used in conjunction with waters derived from the effluent from the sewage disposal plant at the Carlsbad Army Air Field with the waters produced from said air field to irrigate a total of 120 acres of land. In this use the wells were utilized to their full capacity of 400 gallons per minute. The effluent used by the plaintiff from the army air field sewage disposal plant was derived from wells drilled prior to the establishment of the Carlsbad Underground Water Basin. However, they are presently within the boundaries of said basin.

After wells Nos. C–223 and C–224 were drilled, waters from well No. C–223 were thereafter applied to beneficial use on lands belonging to a certain protestant, Allen S. Kaltenbach, which were described in the findings, amounting to 10 acres and were later sold by the plaintiff to said Kaltenbach. (There being no dispute concerning the Kaltenbach acreage, any further mention of it is only incidental to portrayal of the facts.)

After the flow of sewage effluent from the Carlsbad Army Air Field ceased, with the abandonment of the field as an active air base, plaintiff applied to the State Engineer to move the rights initiated by him under both wells mentioned to a certain 58 acres of land in the east half of southeast quarter of section 30, township 22 south, range 27 east, N.M.P.M., approximately a mile and one-half distant therefrom. The applications were both denied by the State Engineer without a hearing. In such applications, the plaintiff expressly

exempted the lands and water right under well No. C–223 which had become appurtenant to the lands sold to Kaltenbach.

The moving of water from wells Nos. C–223 and C–224 will not materially affect or impair the rights of persons utilizing wells near the east half of southeast quarter of section 30, township 22 south, range 27 east (the move-to area), or the rights of others in the Carlsbad Underground Water Basin. Nevertheless, it should be stated that the moving of the use of water as requested in plaintiff's application will result in a move to an area in which there are more wells in operation than are operating in the area from which the use of water is now authorized. There is no substantial difference in the water table within the two areas.

On May 19, 1950, the State Engineer advised applicant by letter that his declared water rights would be recognized as valid only so long as, and at times when, sewage was available for diversion and provided always that the sewage water was used to the extent of its availability. The letter further provided that the underground water right was merely supplemental to the sewage source and would become void when and if such sewage source was eliminated. Having made findings of fact as hereinabove summarized, the court adopted its conclusions of law. In them it declared that the drilling of well No. C–223 and the

completion of works thereon followed by the application of water to beneficial use therefrom, the plaintiff acquired the legal right to use of waters from said well out of the waters then within the Carlsbad Underground Water Basin to the extent of 400 gallons per minute and became the owner of such right, except for the portion thereof transferred to Kaltenbach.

The court went on to state in its conclusions that by the drilling of well No. C–224, the completion of works thereon and the application of water to beneficial use therefrom, the plaintiff acquired the right to use of waters in Carlsbad Underground Water Basin to the extent of 400 gallons per minute and became the owner of such right. That the amount of water right to which plaintiff was entitled out of wells C–223 and C–224 from the waters of said basin exceeds the amount of water sought to be transferred under the pending applications.

The court also concluded that the transfer of water rights of the plaintiff under such wells in accordance with the pending applications would not operate to impair existing rights but that such transfer, nevertheless, should be subject to prior rights of users of water within the area to which the transfer was sought. Accordingly, the court concluded that the transfers sought of water rights from wells Nos. C–223 and C–224, the move-from area

for the irrigation of 58 acres of land described in the move-to area, should be allowed. The court closed its conclusions with the parting admonition that the declaration of the State Engineer in his letter of May 19, 1950, above mentioned, limiting recognition of water rights of the plaintiff was an improper limitation of his water rights under the laws of New Mexico having to do with the appropriation and use of public underground waters.

The attorney general and the special assistant attorney general, representing the State Engineer, have argued the errors assigned under three points. Point No. 1 presents the interesting proposition that on an appeal from a decision of the State Engineer in a matter of the kind before us, he is not to be overruled in his determination of the matter "unless his acts are unlawful, unreasonable, arbitrary, capricious, or are not supported by evidence."

Point No. 2 is dual in character. It is to the effect that on an application to change the place or method of use of water an applicant has the two-fold burden of proving (a) the nature and extent of his water rights and (b) that the change will not impair existing rights. Point No. 3 puts forward the proposition that on entertaining the application in the case at bar, the decision of the court was not based on a preponderance of the evidence in plaintiff's (appellee's) favor but actually is contrary to the evidence.

It is readily to be seen from a recitation of the points thus relied upon for reversal, they overlap each other to such an extent that it will simplify the matter for purposes of discussion if we treat them together, actually resolving only such of the questions involved as are deemed necessary to a decision.

■ It is our considered judgment that sub-section (a) of Point one (1) advanced by counsel for the State Engineer is well taken and must be sustained. It asserts the burden of proof in an application of the kind before us is on the applicant to show the change sought will not impair existing rights. Indeed, as a part of the same point the defendant claims the benefit of this burden as to a showing by plaintiff of the nature and extent of his water rights, arguing strenuously that he has failed in this particular as well.

In this connection defense counsel quote from plaintiff's declarations Nos. C–223 and C–224 of ownership of underground waters to the effect that the wells involved were to be used to supplement the effluent from sewage disposal at Carlsbad Army Air Base, thus not constituting primary water rights. Counsel for State Engineer rely, also, upon other statements in the declarations and as well testimony by plaintiff at the trial touching the extent of use of water from these wells as failing to show any substantial application to beneficial use, apart from such

use as a mere supplement to effluent from sewage disposal at Carlsbad Army Air Base.

It will not be our purpose, however, to question plaintiff's ownership of the water rights claimed. We thus do him no prejudice in this behalf and assume for purpose of our decision his ownership of the water rights claimed. This eliminates the necessity of determining whether, as so strongly urged by counsel for defendant, there is a failure on plaintiff's part to sustain the burden said to rest on him of showing the nature and extent of his rights. It leaves with him, however, the unsustained burden, if it rests on him, of establishing that the granting of his application will not impair other existing rights.

Counsel for defendant cite us to and quote 1953 Comp. § 75–11–7 as supporting their claim that the burden of proving existing rights are not impaired rests on the plaintiff as applicant. It reads:

"The owner of a water right may change the location of his well or change the use of the water, but only upon application to the state engineer and upon showing that such change or changes will not impair existing rights and to be granted only after such advertisement and hearing as are prescribed in the case of original applications."

We think there can be no doubt that under the plain language of this statute the burden of proof in the respect mentioned rests squarely upon the plaintiff. We are equally satisfied that, as claimed by defendant, the record is absolutely devoid of proof that existing rights are not, or will not be, impaired. If there be anything by way of testimony or documentary evidence tending to support the finding that existing rights will not be impaired, we are unable to find it. Indeed, such evidence as there is touching the issue would seem by implication to support an inference that such rights would be impaired.

Practically, the only evidence submitted on the question whether existing rights would be impaired came from J. C. Yates, one of the staff of hydraulic engineers from the office of State Engineer. On this vital issue, he testified:

"Q. And will you please point out the number of wells in the radius of one mile in the move-from area? A. I have shown three wells in Mr. Spencer's northeast quarter of Section 25 and lands having—lands totaling about 140 acres.

"The Court: That is the northwest quarter of Section 25, is it not? A. Yes sir.

"The Court: All right. A. Three wells to the south are the air-base wells. Up in the northeast corner of Section 24, there is an existing permit up there. The well has been drilled. I don't know

whether it is being used or not. I do not say that that is all of the irrigation and all of the wells in that area but it is all that I know of from our records.

"Q. (By Mr. Harris) In the move-to area will you count up the number of wells within a radius of one mile? A. Well, I have plotted 11 wells within the one mile radius and then there is three more that lie just outside of it, and the cross-hatch area represents the area which I believe has valid water rights.

"Q. Going back to these graphs at the top of the page, Mr. Yates, will you point out the maximum of foot decline or rise in every year from '47 to '52 within a one mile radius of the move-to area? A. Well, for the year 1947, the water level declined about 13 feet in the move-to area. In the year 1948, the decline was about 4 feet. During 1949, it rose something like five feet.. During 1950, it rose about two feet. In the year 1951, it declined about 18 feet.

"Q. And will you point out how much the decline or rise was in the move-from area in those years? A. The decline would be something less, not very much less. For all practical purposes in 1947 it would be the same. In 1948, it would be a little less decline. In 1949, it was probably the same. In 1950, the rise was a little less, and in 1951 it was about the same. For all practical purposes, the change in water level of both areas is about the same.

"Q. In that general area, has there been a pretty much of a sink hole development? A. Yes, there is an area located about a mile and a half or two miles southeast of the move-to area in the southeast quarter of Section 30 that is a big hole in the ground water. Declines there have been rather serious. In 1951, it was 22 feet.

"Q. And based upon that, the move-to area would be nearer the center of this decline than the move-from area, is that correct? A. Yes. It is moving toward that sink of heavy declines.

"Q. Would you say in your opinion that the move-to area is an area of higher concentration of irrigation as well as toward an area of greater decline in the water table? A. It is certainly toward an area of greater intensification of pumps and farming and it approaches the heavy declines south of that area.

"Q. Do you know if the State Engineer has ever allowed a move of this sort toward where there is that much difference in decline toward a more heavier concentrated irrigation? A. Well, I can't say that he has never. It is certainly against his policy to.

"Q. Will you state what his policy is in that regard? A. Well, his policy is to not permit moves into more dense areas of pumping or toward more—toward more dense areas of greater intensity—density, in pumpage or diversion from ground water."

To the extent, if at all, there was any contradiction or impeachment in the record of the testimony of Engineer Yates on the issue whether the granting of plaintiff's application would impair existing rights, it is to be found in the cross-examination of this witness by plaintiff's attorney. It follows:

"Q. Mr. Yates, have you made any study in the decline in the water table and underground wells in this basin? A. I have not myself made the study. I have these studies made by the Geological Survey.

"Q. They reflect in all areas south of Carlsbad a decline in this underground water table, don't they? A. They do. I have those maps for that same period of time if you want them.

"Q. They reflect approximately the same declines that appear in this area? A. I would have to look at those maps.

"Q. Will you look at them, please? (Whereupon, the witness leaves the stand and obtains maps referred to.) A. For the year 1947, the greatest decline in the whole basin was in that area just to the—about two miles east of Section 30.

"Q. That would be two miles east of where the application is made to move this water to, wouldn't it? A. Yes sir.

"Q. And on this map which you have prepared, you have not shown any wells east of the basin and within the boundaries of the Carlsbad Irrigation District, have you, the map which you prepared and offered in evidence? A. That map does not show any wells on the contour water level changes.

"Q. This map which you have prepared does not show any wells east of the main canal of the Carlsbad project, does it? A. No sir.

"Q. There are wells in that area which have been allowed by the State Engineer and are now pumping which have surface rights appurtenant, aren't there? A. Yes sir.

"Q. And the greatest decline in the water level in that basin is in that area? A. Not for the year '47 it was not.

"Q. I am talking about for the present, you have just said that the greatest decline is two miles east of the point to which the land was—the water was to be moved in this case? A. There is a 14 foot contour, the edge of which is about three quarters of a mile from the

move-to area. That contour covers a mile and a half and the larger portion of it is to the west of the canal.

"Q. And part of it is to the east of the canal? A. And about a fourth of it is east of the canal, yes sir.

"Q. And is this basin one that when you permit drilling of additional wells, over the project generally, it has a tendency to decrease the general water level, Mr. Yates, in the basin? A. Yes, it would, provided those wells were pumped.

"Q. As a matter of fact, you have, the State Engineer has permitted since the basin was established about how many irrigating wells to be drilled on project lands? A. I couldn't say except possibly more than a hundred.

"Q. And they are being used heavily, aren't they? A. I believe they are.

"Q. And they were used heavily in 1950, weren't they? A. I don't know. They were used heavily in 1951.

"Q. And much of the decline is due in the water level at the point to which this water is sought to be moved, is due to these added wells, isn't it, over the basin generally? A. I don't think so. I think the decline in that area to which Mr. Spencer—in which Mr. Spencer's rights are located and the area to which

he has moved is caused principally by the pumpage in that area. Now, I think that is the principal cause; the wells to the east of the canal affect it, of course.

"Q. And those are wells drilled subsequent to the creation of the basin? A. Many of them are, yes sir.

"Q. And if a right existed in Mr. Spencer in this case, it would be prior to any of those rights, wouldn't it? A. It would be prior to permit rights. It would not be prior to rights which— for wells that may have been drilled before his wells.

"Q. But drawing on the area to which this water is proposed to be moved, you do have wells initiated under permit from the State Engineer subsequent in point of time to the drilling of Mr. Spencer's wells? A. Oh, yes sir."

The last quoted testimony of Engineer Yates discloses, to be sure, that when permission to drill additional wells over the project *generally* is granted, it has a tendency to decrease the general water level, providing all the wells are pumped. This, of course, is a natural and an obvious result. The testimony also discloses that the State Engineer, since the basin was established, has permitted possibly more than a hundred wells to be drilled on project lands which are being used heavily all the time. But

the witness declined to attribute the decline in the water level noted at the point of the move-to area to the drilling of these additional wells over the basin generally. On the contrary, the witness replied to such an inquiry:

"I don't think so. I think the declines in that area to which Mr. Spencer—in which Mr. Spencer's rights are located and the area to which he has moved is caused principally by the pumpage in that area. Now, I think that is the principal cause; the wells to the east of the canal affect it, of course."

The implications from succeeding testimony of the witness as well as throughout his cross-examination only demonstrate that the State Engineer has allowed the drilling of some additional wells over the basin as a whole, with a priority subsequent in point of time to plaintiff's. Admittedly, this fact, if true, could have but little, if any, bearing on the question whether existing rights would be impaired by the change in place and use of plaintiff's rights from wells C–223 and C–224, a place of slight concentration of drilling, to the move-to area where a veritable flock of wells is concentrated over the same radius of one mile, and that, too, in the general direction of the area of greatest drop in the water level—22 feet—since the basin was established. A careful analysis of Engineer Yates' testimony both

on direct and cross-examination leaves us well convinced that the plaintiff did not sustain the burden of showing the change sought would not impair existing rights. Having so failed he did not show himself entitled to the relief sought.

One interesting phase of testimony in the record is the notice published by the State Engineer at the opening of the basin. It reads:

"Carlsbad Basin is presently open to filing of applications for appropriation of underground waters for supplemental use on lands with *existing surface rights.*" (Emphasis ours.)

The surface rights referred to are for direct appropriation from Pecos River. This is made clear in certain testimony of the Engineer Yates. He testified:

"Q. Mr. Yates, when an application is submitted for supplemental wells for surface rights, does the State Engineer consider that that is an application for additional appropriation of water? A. Additional appropriation of what?

"Q. Of water? In other words, if a farmer has a duty of water of three acre feet of water per acre under a surface right, he isn't allowed to appropriate more water than that supplemented with underground water? A. No, his over all water right does not

change. It is true that it derives, part of it then derives from the underground and part from the surface flow of the stream, but his right to the use of water does not change.

"Q. In the over-all picture then he isn't getting an additional appropriation of water, is that right? A. No, he is not.

"Q. And the water he gets, as the office of the State Engineer understands it, is from the same water source whether it is from the surface or from underground because the underground water comes from the Pecos River, is that right? A. Yes sir. There is actually no difference between the water in the stream and the water underground when you consider the basin as a whole. The water underground, under one piece of land is probably on top of the land further down stream and water loss upstream probably comes to the surface further down.

"Q. And therefore, the State Engineer is trying to administer the water law according to the best knowledge of hydrology that he can obtain? A. I think so, yes sir."

Much argument in the briefs is devoted to a discussion of the effect of the findings of the State Engineer in a case of this kind. To what weight, if any, is a finding by him entitled when the cause comes on before the district court for hearing an appeal? And what effect, if any, is to be given a decision involving an exercise of discretion by him? In the original act providing for appeals from State Engineer to the board of water commissioners and thence to the district court, it was provided that the trial in the district court should be *de novo*, L.1907, c. 49, § 66, Code 1915, § 5724. The amendment by L.1923, c. 28, § 1, 1953 Comp., § 75–6–1, eliminating the appeal to the water board in favor of a direct appeal from decision of State Engineer to district court, carried forward the provision for a trial *de novo* in the district court.

Counsel for the plaintiff pin their greatest faith in what this court said in Farmers Development Company v. Rayado Land & Irrigation Co., 18 N.M. 1, 133 P. 104, 106. Among other things, we said:

"The act in question, as shown by the above excerpts, clearly shows that in each instance, where a hearing is provided for, or required, the same shall be *de novo*, or an original hearing, where the engineer, board of water commissioners or the court hears such competent proof as may be offered by the parties interested in the proceeding, and forms his or its own independent judgment relative to the issues involved. The board of water commissioners does not, nor is it called upon, to review the discretion of the engineer.

Upon appeal to it, it determines for itself the question as to whether the application should be approved or rejected. It is not bound, controlled, *or necessarily influenced,* in any way, by the action of the engineer. It hears, or may hear, additional evidence, and upon the record, and such evidence as is properly before it, it decides the question presented. Likewise in the district court, the hearing is *de novo*. The court may consider such evidence as has been introduced before the board and engineer, and transcribed and filed with it; but it also hears additional evidence, and is not called upon to determine whether the engineer or the board of water commissioners erred in the action taken and order entered, but must form its own conclusion and enter such judgment as the proof warrants and the law requires. It does not review the discretion of the engineer or the board, but determines, as in this case it was required by the issue presented, whether appellee's application to appropriate water should be granted. *The court, in order to form a conclusion upon the issues, was necessarily required to determine, for itself, whether there was unappropriated water available, whether the approval of the application would be contrary to the public interest, and all other questions which the engineer was required, in the first in-*stance, *to determine*. In such case the question recurs anew as to whether the application shall be granted. This being true, the second assignment of error must fail, because it is not well taken." (Emphasis ours.)

Counsel for the State Engineer putting chief reliance on our decisions in Harris v. State Corporation Commission, 46 N.M. 352, 129 P.2d 323; Floeck v. Bureau of Revenue, 44 N.M. 194, 100 P.2d 225, and Yarbrough v. Montoya, 54 N.M. 91, 214 P.2d 769, contend the finding or decision of the State Engineer is not to be disregarded or set aside unless unlawful or unreasonable, that is, "capricious" or "arbitrary."

There is much to support them in their claim to such a holding in what is to be read from language of Mr. Justice McGhee in Yarbrough v. Montoya, supra. There, too, we were dealing with a statute authorizing an appeal to the district court from the decision of the Chief of the Division of Liquor Control upon which the hearing or trial was to be *de novo,* as in the case at bar. Apparently, the decision in the Rayado Land & Irrigation case went unnoticed when we were considering Yarbrough v. Montoya. To say the least, it was not cited. And there was even a hint in the latter case that to hold otherwise than we did on the question at issue would subject the statute involved to serious question of its constitutionality.

However, without appraising Yarbrough v. Montoya, supra, as a modification of our decision in the Rayado case, as it may well be deemed, we can see room within the full scope of the holding in the latter case, in the language "or necessarily influenced" italicized above, for the district court to give weight to a merited finding of the State Engineer. Just as we can find support in Manning v. Perry, infra, for a modification of Rayado case and still preserve the *de novo* trial provided for.

A case much like the present and relied upon strongly by the defendant, is Manning v. Perry, 48 Ariz. 425, 62 P.2d 693, 695, mentioned next above. It contains language in which we can find little to criticize, if we should be called upon to speak decisively on the question discussed, as we are not in view of the conclusion reached. In that case the Supreme Court of Arizona, without denying the appeal to the district court character as a trial *de novo*, would decline to overturn the decision of the State Engineer, unless it "be without support of the evidence, or is contrary to the evidence, or is the result of fraud or misapplication of the law."

The administration of the public waters of the state, especially the underground waters is a task requiring expert scientific knowledge of hydrology of the highest order. The administration of surface waters alone, where the trained and experienced engineer may see and observe what he does, or should do, and what the agency he administers is doing, is beset by difficulties enough. But when the administration is turned to underground waters the engineer's troubles are multiplied a hundredfold.

We are satisfied we need not here decide just what effect the decision of the State Engineer should be given in the *de novo* trial provided for the hearing of an appeal. Especially, is this true in view of our conclusion that the plaintiff has failed to satisfy his burden of proving existing rights will not be impaired by the granting of his application. We think we have demonstrated however, it will be an unfortunate day and event when it is established in New Mexico, that the district courts must take over and substitute their judgment for that of the skilled and trained hydrologists of the State Engineer's office in the administration of so complicated a subject as the underground waters of this state.

Fortunately, we find it unnecessary to make this case the basis for any such declaration. It follows from what has been said that the judgment of the trial court should be reversed and the cause remanded to the district court with a direction to set aside its judgment and enter a new one denying the application of the plaintiff.

It will be so ordered.

COMPTON, C. J., and LUJAN, McGHEE and KIKER, JJ., concur.