522 P.2d 796

Application of the City of Roswell, RA–98, et al. to Change Location of Wells and Place and Purpose of Use of Underground Waters and To Combine Underground Water Rights of the Roswell Artesian Basin:

**CITY OF ROSWELL, Applicant-Appellant,**

**v.**

**S. E. REYNOLDS, New Mexico State Engineer, Respondent-Appellee.**

**No. 9836.**

Supreme Court of New Mexico.

May 24, 1974.

250

William C. Schauer, Alamogordo, James B. Stapp, Roswell, for applicant-appellant. .

David L. Norvell, Atty. Gen., Paul L. Bloom, Asst. Atty. Gen., Roy G. Hill, Sp. Asst. Atty. Gen., Sante Fe, for respondent-appellee.

## OPINION

OMAN, Justice.

This case originated with an application by the City of Roswell directed to the State Engineer. The City sought authority to change the points of appropriation of (1) 8,620 gallons of water per minute (g. p.m.) and (2) 1,313.96 acre feet of water per annum from the Roswell Underground Water Basin. The City has established rights to withdraw these waters from the Basin through certain wells (move-from wells), and it sought to move the points of appropriation of these waters from these wells to eight other wells (move-to wells) through which the City has established rights to appropriate still other waters from the Basin.

After an administrative hearing upon the application conducted before the State Engineer, an order was entered granting the City authority to change the points of diversion or appropriation, but this authority was conditioned upon a reduction in both the quantity and rate of pumpage of waters from the move-to wells. The City appealed to the district court pursuant to Art. XVI, § 5, Constitution of New Mexico and § 75–6–1, N.M.S.A. 1953 (Repl.Vol. 11, pt. 2, 1968, Supp.1973). After a proceeding de novo, the district court entered a judgment affirming the order of the State Engineer. The City appealed. We affirm.

The purpose of seeking the change in the points of appropriation was that of securing water with a lower saline content. The facts, as found by the district court, and which are essential to a resolution of the issues on appeal, are as follows:

(1) Before the withdrawal by wells of waters from the Basin, these waters, both fresh and saline, were in dynamic equilibrium and were discharged naturally into the Pecos River and its tributaries. Saline waters in the Artesian aquifer were also discharged to the east beneath the Pecos River.

(2) The chloride content of water is an indicator of the concentration of dissolved solids in the water. A chloride content of 500 parts per million (p. p. m.) is found in water from the artesian aquifer north and east of the City. The move-from wells are located to the northeast of the City.

(3) Since August 1952 the 500 p. p. m. and the 1,000 p. p. m. isochlor lines (an isochlor is a line of equal chloride content) have moved substantially to the west and southwest from the area east and northeast of the City, indicating that salt water is moving generally westerly and southwesterly in the artesian aquifer.

(4) In the Basin there is a general correlation between the lowering of the artesian head and an increase in the salinity of water from artesian wells. Artesian well pumping has lowered the pressure, decreased the natural discharge of waters from the artesian aquifer, and caused some of the salt formerly discharged naturally from the artesian aquifer to be discharged through waters from the wells thereby increasing the salt content of the water produced from these wells. Saline water movement into artesian wells results from both vertical and horizontal motion of salt water in the artesian aquifer.

(5) If the City were permitted to appropriate through the wells in the move-to area the same total quantity of water which it is now entitled to appropriate under existing rights in the move-from area, in addition to the amounts presently allowed to be taken from the wells in the move-to area, the rate of decline of the artesian head in the vicinity of the move-to wells and the salinity of water available to wells in that vicinity would be increased.

(6) In general, an increase above certain levels of the salinity of water used for irrigation of crops results in a decrease of yield per unit of water used. The salinity concentration, which causes reduced crop yields, varies with irrigation techniques, the character of the soil and the nature of the crops. In order to avoid a reduction in crop yield by an increase in the salinity of the irrigation water used, a greater amount of water must be used to provide leaching.

(7) The salinity of the water in the artesian aquifer in the vicinity of the move-from wells is greater than the salinity of the water in the artesian aquifer in the vicinity of the move-to wells.

(8) The termination of water withdrawals from the move-from wells would raise the artesian water level and improve the quality of the water in the vicinity of those wells. This would increase the movement of a better quality of water from that area toward the move-to wells.

(9) Additional decline in the artesian water level in the move-to area would accelerate the upward movement toward the wells in that vicinity of waters of greater salinity found in the lower portions of the artesian aquifer and in a lateral movement from the north and east toward those wells of waters of greater salinity.

(10) If changes in locations of withdrawal or appropriations of waters from the Basin are limited to the extent that the changes cause no decline of artesian water level in any well in any ownership other than that of the City (critical well), no impairment by reason of reduced water quality would result to existing rights.

(11) If appropriate measuring devices are installed, water rights defined by volume (acre feet per year) and rights defined by rate of withdrawal (gallons per minute) can be exercised by making withdrawals from the same wells with the effect on the waters of the Basin being the same as if each of the two defined rights were appropriated through separate wells.

(12) The evidence will not support a finding that crop yields, per unit of water applied in the move-to area, would not be reduced by reason of increased salinity in the waters in that area caused by the requested increase of withdrawals of waters from the Basin in that area.

(13) The amount of water which can be appropriated from the move-to wells without increasing the rate of decline of the water level in any well owned by someone other than the City, provided all appropriation of water from the move-from wells is terminated, is shown in the last columns of the following table:

| "Move-from area (State's Exhibit 2) | Value of rights in move-from pumping center | Attachment to Application which describes move-from rights | | Move-to value without causing additional drawdown in the critical well |
|---|---|---|---|---|
| | | | Percent | Value |
| A | 278.31 acre feet | B | 34 | 94.62 acre feet |
| A | 431.64 acre feet | D | 38 | 164.02 acre feet |
| B | 133.50 acre feet | B | 54 | 72.09 acre feet |
| C | 132.00 acre feet | B | 67 | 88.44 acre feet |
| Move-to area | 338.51 acre feet | B | 100 | 338.51 acre feet |
| — | 911.37 acre feet | C | 100 | 911.37 acre feet |
| Total | 2,225.33 acre feet | — | (75) | 1,669.05 acre feet |
| D | 4,820 gpm | A & E | 51 | 2,458 gpm |
| E | 3,800 gpm | A & E | 61 | 2,318 gpm |
| Total | 8,620 gpm | | (55) | 4,776 gpm " |

None of the facts found by the trial court as recited in the first twelve numbered paragraphs above have been directly attacked. Thus, these are facts which must be accepted as true by this court on this appeal. See Romero v. Sanchez, 86 N.M. 55, 519 P.2d 291 (1974); Wood v. Citizens Standard Life Insurance Company, 82 N.M. 271, 480 P.2d 161 (1971); State ex rel. Thornton v. Hesselden Const. Co., 80 N.M. 121, 452 P.2d 190 (1969).

The City has challenged the facts found and recited in paragraph 13 above to the extent that it contends the last three lines of the table shown thereunder should read:

| "D | 7774 acre feet | (4820 gpm) | A & E | 51 | 3965 acre feet |
| E | 6129 acre feet | (3800 gpm) | A & E | 61 | 3738 acre feet |
| Total | 13903 acre feet | (8620 gpm) | | 55 | 7703 acre feet at rate not to exceed 8620 gpm" |

———◆———

■ The City also challenges the correctness of the district court's conclusion No. 1, which was as follows:

"That the granting of the application to allow an appropriation thereunder of 1,669.05 acre-feet by and from the [move-to] wells * * * together with an additional appropriation therefrom at a rate not to exceed 4,776 gpm will not impair existing rights."

The City urges that the trial court should have adopted its requested conclusion No. 2 instead of the court's conclusion No. 1. The requested conclusion No. 2 reads:

"That the approval of the Application herein of the rights sought to be transferred thereby, to the extent of:

"(a) 1669.05 acre feet per annum, and

"(b) 7703 acre feet per annum, at a rate of withdrawal not to exceed 8,620 gpm, would not cause an increase in the rate of water level lowering at any well in any ownership other than the Applicant's."

The City offered to reduce its water rights involved in the proposed transfer by one-fourth, if the proposal were otherwise granted, but the district court apparently refused the offer as inadequate to protect against impairment of other existing rights.

The City apparently takes the position that throughout the proceedings in the district court the witnesses and the parties were considering *amounts* of water rather than the *rate of withdrawal* of water in making calculations as to the percentage of water rights which could be transferred from the move-from area to the move-to area without affecting the water level in the so-called "critical well." In other words, the City says its rights to so many acre feet of water per annum and its rights to withdraw so many gpm were confused, and that the district court erred in applying the percentage of reduction, arrived at by calculations applicable to the volume of water (acre feet), to rate of withdrawal (gpm).

We disagree. The witnesses clearly referred to the different rights of the City, and there was no confusion of the two types of rights by the witnesses in their calculations or in the application of the results of those calculations to the different rights.

■ We agree with the City that the lowering of the water table does not necessarily constitute an impairment of the water rights of adjoining appropriators. Mathers v. Texaco, Inc., 77 N.M. 239, 421 P.2d 771 (1966); Application of Brown, 65 N.M. 74, 332 P.2d 475 (1958). However, it does not follow that the lowering of the water table may never in itself constitute an impairment of existing rights. Whether there is impairment depends upon the facts of each case. City of Roswell v. Berry, 80 N.M. 110, 452 P.2d 179 (1969); Mathers v. Texaco, Inc., supra; Heine v. Reynolds, 69 N.M. 398, 367 P.2d 708 (1962). In the present case, we are also concerned with impairment by reason of increase in the salinity of the water by reason of a lowering of the water table.

■ The facts as found by the trial court and which are unchallenged clearly support the district court's conclusion "that the City * * * has failed to prove that

granting the application as submitted will not impair existing water rights." The City had the burden of proving that the granting of its application would not impair existing rights of others. Heine v. Reynolds, supra; In re Hobson, 64 N.M. 462, 330 P.2d 547 (1958); Spencer v. Bliss, 60 N.M. 16, 287 P.2d 221 (1955); § 75–11–7(A), N.M.S.A. 1953 (Repl.Vol. 11, pt. 2, 1968, Supp.1973). In this the City failed, even though it voluntarily offered to reduce by 25% its rights involved in the proposed transfer. The district court was under no duty to find the degree of impairment which would result if the application, as amended by the City's offer to reduce its rights by 25%, were granted. Once it had determined from the facts that the City had failed to prove there would be no impairment to existing rights, it then had the duty to deny the application. See Mathers v. Texaco, Inc., supra; Heine v. Reynolds, supra.

■ The City further contends that some 20 of its requested findings of fact were improperly refused by the district court. Two of these requests sought to have the district court make findings as to the exact extent the water level would be lowered and the precise number of p. p. m. that the chloride content of the water would be increased in the move-to area if the application were granted. Even if we were to assume that the evidence would support no other specific findings as to the precise amount the water level would be lowered and the water salinity increased, this still would not demonstrate error on the part of the district court in refusing these requested findings. At most these would be evidentiary findings pertaining only to the degree of impairment which would result if the application were granted. The trial court was obliged only to make findings of such ultimate facts as would support a conclusion that the City had failed to prove that the granting of its application would not impair existing rights. As discussed above, a conclusion to this effect was entered and is supported by the unchallenged findings of fact made by the district court.

Eleven more of these requested findings relate entirely to specific evidentiary matters or to other matters which cannot properly be considered as ultimate facts essential to support of the conclusions and the judgment entered thereon from which this appeal is taken.

■ Six of these requested findings relate to the fact that the Basin is overappropriated, that overappropriation is the primary cause of salt encroachment, or that the City's rights have priority over the rights of many other users of water from the Basin. Even if we were to concede these to be indisputable facts, it would not follow that the district court erred in refusing to so find. This was not a proceeding in which the City was asserting its priority over the rights of other water users. The basic issue in these proceedings was whether the City could properly change the points of appropriation of certain of its rights to waters from the Basin without impairing existing rights of others to appropriate waters therefrom, and under what conditions or limitations this change could lawfully be effected, if at all. The district court made findings on all facts essential to support its conclusions on this issue.

■ The final requested finding which was refused related to the fact that the owners of rights from the five wells closest to the move-to center of pumping offered to file waivers of any rights they had to object to the granting of the City's application. If for no other reason, the City must fail in its claim of error in this respect because no evidence was received which would support this finding. Some instruments were offered which would apparently have given some support to the requested finding, but objections were made thereto upon different grounds, the objections were sustained, and the instruments were never received into evidence. The City has made no direct attack upon the validity of the district court's ruling that

these instruments were inadmissible, and has not presented argument on this question. Under these circumstances, the question of the correctness of the district court's exclusion from evidence of the tendered exhibits is not before us. See Laughlin v. Laughlin, 49 N.M. 20, 155 P.2d 1010 (1944); Springer Transfer Co. v. City of Albuquerque, 44 N.M. 407, 103 P. 2d 129 (1940). See also McLam v. Mc-Lam, 85 N.M. 196, 510 P.2d 914 (1973); Novak v. Dow, 82 N.M. 30, 474 P.2d 712 (1970); Petritsis v. Simpier, 82 N.M. 4, 474 P.2d 490 (1970); Morris v. Merchant, 77 N.M. 411, 423 P.2d 606 (1967).

 In its final point relied upon for reversal, the City contends the district court erred in making certain conclusions of law and in denying a number of the City's requested conclusions. The argument under this point is very brief and supported by no authority. It was the duty of the City to prove that the granting of its application, as amended by its offer to reduce its rights by 25%, would not impair existing rights. City of Roswell v. Berry, supra; Durand v. Reynolds, 75 N.M. 497, 406 P.2d 817 (1965); Heine v. Reynolds, supra; Spencer v. Bliss, supra. The district court concluded that it had not met this burden, and this conclusion is supported by the court's findings of fact. At least one of the City's requested conclusions was contrary thereto.

Other requested conclusions related to the so-called critical well theory; a claim that other appropriators had been permitted to change their points of appropriation, and consequently the City should be granted the same right; and that so long as others with rights inferior to those of the City were permitted to appropriate waters from the Basin, the City should not be prohibited from changing its points of appropriation in order to capture waters of substantially the same quality as were initially available to the City from its move-from wells. These requests are not supported by the district court's findings of fact, are not essential to a determination of the issues in

this case, or are clearly outside the issues. The State Engineer initially, and the district court on the appeal de novo, had the authority to approve the City's application subject to conditions necessary to prevent impairment of existing rights. City of Roswell v. Berry, supra; W. S. Ranch Company v. Kaiser Steel Corporation, 79 N.M. 65, 439 P.2d 714 (1968); City of Albuquerque v. Reynolds, 71 N.M. 428, 379 P.2d 73 (1962). The application has been approved subject to such conditions.

The judgment should be affirmed.

It is so ordered.

McMANUS, C. J., and STEPHENSON, J., concur.