416 P.2d 641

**FAIRFIELD IRRIGATION COMPANY,**
a corporation, et al., Plaintiffs
and Respondents,

v.

M. Kenneth WHITE, Defendant
and Appellant.
Ralph M. SMITH, Defendant and
Respondent,

v.

COOPERATIVE SECURITY CORPORA-
TION, a non-profit corporation of the State
of Utah, Additional Defendant on Cross
Complaint and Respondent.

No. 10448.

Supreme Court of Utah.

July 12, 1966.

Joseph Novak, Salt Lake City, for appellant.

E. W. Clyde, Salt Lake City, for respondent Fairfield Irr. Co.

O. DeVere Wootton, American Fork, for respondent Ralph M. Smith.

H. D. Lowry, Salt Lake City, for respondent Cooperative Security Corp.

CROCKETT, Justice:

In contest here are rights to the use of underground waters in Cedar Valley, a small valley to the west of Utah Lake in central Utah.

Fairfield Irrigation Company (herein called Fairfield) and its stockholders have anciently established rights[1] to put to beneficial use waters arising from a spring area called Fairfield Springs, just west of the town of Fairfield in Utah County.

Since 1951 the defendant, M. Kenneth White, and Cooperative Security Corporation, adjunct organization of the L.D.S. Church,[2] have drilled a number of pump wells two to three miles to the north in the same valley which plaintiffs claim decrease the flow of the Fairfield Springs.

After a trial, the court entered a decree enjoining White from pumping his wells except upon specified conditions and prescribing replacement of water[3] necessary to assure the plaintiffs the water they are entitled to under their prior claims to the water of Fairfield Springs; and assessed damages of $532 in favor of Fairfield and four individual plaintiffs.

As to the church cooperative wells, the court found that the evidence failed to show a direct relationship between those wells and the flow of Fairfield Springs. It refused to grant an injunction, but retained jurisdiction to take further evidence in the future as to any such interference. From this decree defendant White appeals.

The court found that the plaintiffs had these prior rights to use waters from the Fairfield Spring area:

a. For domestic use for the people living in Fairfield. The water is collected in a

---

1. Rights established by putting water to a beneficial use prior to the enactment of Chap. 100, S.L.U. 1903, which act required filing with the state engineer after that date; see Hanson v. Salt Lake City, 115 Utah 404, 205 P.2d 255.

2. The Church of Jesus Christ of Latter-Day Saints, commonly called the Mormon Church.

3. Sec. 73-3-23, U.C.A.1953, see Current Creek Irr. Co. v. Andrews, 9 Utah 2d 324, 344 P.2d 528.

metal tank, five feet in diameter, placed over a spring slightly higher in elevation than the main spring area. The outlet is by four-inch pipe out of the side of this tank and thence through a pipeline to the town. The water normally stands about 18 inches above the outlet. This gives adequate pressure for existing outlets in the town water system.

b. For irrigation of certain lands by stockholders of Fairfield on a "turns" basis, depending on the number of primary shares held by each stockholder, during the irrigation season from April 20 to October 20 of each year.

c. For winter irrigation during the non-growing season from October 20 to April 20 of lands by Hillside Stake Farm [an L.D.S. Church cooperative farm] and certain named Fairfield stockholders.

d. For livestock-watering purposes by means of a one-inch hole in the company diversion headgate that allows water to flow into a natural channel which supplemented by seeps and springs along its course, flows a distance of two miles to provide water for the livestock kept by landowners abutting this channel.

In addition to the foregoing rights in water from the springs, other water rights were found to exist in these underground waters for stock-watering and domestic wells on the farms of Ernest Carson, Reed Carson, Norman Erickson and the Hillside Stake. All except the latter are filed as underground water claims with the state engineer; and the Hillside Stake Farm right derives from use prior to 1935.[4]

The plaintiffs' claim is that the water rights recited above were infringed upon by the development of pump wells dug by the defendant White who has farming land north of Fairfield. He first sank a stock-watering well in May 1951. It is about 3½ miles north and slightly east of the Fairfield Springs and apparently has no substantial effect upon their flow. In December of 1961 he drilled an irrigation well (herein called the South Well) considerably closer, that is, about two miles directly north of the Fairfield Springs. A few months later, in March of 1962, he drilled a second irrigation well about 40 feet further north (herein called the North Well). The applications to the state engineer for these wells specified a maximum production of 4 cubic feet per second (c. f. s.) for the South Well; 5 c. f. s. for the North Well and the stock-watering well combined.

These wells were put into operation in May 1962 and shortly thereafter there was a substantial decrease in the flow of Fair-

4. Since the Act of 1935, Chap. 105, S.L.U. 1935, underground water claims have been required to be filed with the state engi-neer; Current Creek Irr. Co. v. Andrews, see footnote 3; Hanson v. Salt Lake City, see footnote 1.

field Springs; and when the pumping was reduced or stopped, the water in the Springs increased. In the 1963 season White kept his wells closed to allow the state engineer to conduct a study of the flow of Fairfield Springs in correlation to the production of his wells. These tests showed that when his wells were pumping the flow of Fairfield Springs decreased and when they were shut down the flow of the Springs increased almost immediately, indicating that the waters were drawn from the same underground water basin.

In February 1964 the state engineer granted White permission to drill a replacement well so he could replace to Fairfield Springs any water necessary to meet the requirements of those having prior rights therein.[5] During 1964 White continued to operate both his irrigation wells and the replacement well almost constantly. By August the water in Fairfield Springs had so diminished that there was not enough water for the domestic use in the town of Fairfield. It became necessary for him to cease operating his South Well in order to meet the requirements of the Fairfield users.

Meanwhile the church cooperative had also begun digging wells in this area in 1951 about the same distance north but further east than the White wells. During the decade from 1951 to 1961 it completed and put in operation six wells; and since that time has drilled and put into production four more wells in that same general area. They are all located somewhat east of White's wells, the closest being about one-half mile east from White's stock-watering well. They were producing during 1962, 63 and 64, when the flow of the Fairfield Springs decreased and increased in correlation to the turning on and off of White's well. But the evidence does not indicate any inter-related action between the production of the church cooperative wells and the flow of the Fairfield Springs.

The errors assigned by defendant White with which we are concerned are:

A. That the evidence does not support the requirement of replacement of water to the plaintiffs of a constant minimum flow of 4.10 c. f. s. and a yield of 1600 acre feet during the irrigation season; nor

B. For a flow of 4.50 c. f. s. for 90 days during the non-growing season between October 20 and April 20; and that the allowance of winter irrigation is erroneous because it is wasteful as a matter of law; and

C. That it is unjust and unlawful to require him to place measuring devices in his wells, particularly when this was not required of the other users; and

5. See footnote 3 above.

D. That the order in regard to plaintiffs' use for domestic and livestock-watering purposes is so indefinite that it is invalid..

■ As to A.: Records of the flow of Fairfield Springs for a period of 18 years, 1942 to 1960, showed the flow was constantly at or above 4.10 c. f. s. except for one reading during that time. These measures were taken by various experts and in different seasons of the year. Measurements taken after White's wells were producing, and of which he seeks to take advantage, could be regarded as not controlling because the equilibrium in the basin had been destroyed and the time required to allow it to readjust to its former condition would be impossible to determine with certainty.

■■ As to B.: We are quite in accord with the idea that the running of water on fields in the non-growing winter season may be wasteful; and that even though the right to such a use may have been established, in situations where there is scarcity of water for more important needs it may be considered as secondary. In this arid region water and its uses are so vital to the public welfare that it has been characterized as its very life blood. Accordingly, it is essential that putting water to the highest and best beneficial use should not only be encouraged but carefully safeguarded.[6] Consistent with this necessity, and due to the nature of water, whether in streams or basins above or underground, it is not subject to absolute ownership in the same way other property is. It belongs to the public,[7] and the rights to use it are appropriable by private individuals only under conditions prescribed by law.[8] Where the right to such a secondary use as the winter flooding of lands is shown to exist, in situations where there is a scarcity of water for more critical needs, for example, for drinking water and for culinary and domestic purposes, the right to use water for winter flooding of lands should be considered and adjudged in relation to those more critical and primary needs.

The principle of primary and secondary rights to the use of water has been recognized by our Legislature. Sec. 73–3–21, U.C.A.1953, entitled Priorities Between Appropriators, states:

Appropriators shall have priority among themselves according to the dates of their respective appropriations, so that each appropriator shall be entitled to receive his whole supply before any subsequent appropriator shall have any right; pro-

---

6. Sec. 73–1–3, U.C.A.1953 provides: Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state. See in Re Water Rights of Escalante Valley Drainage Area, 10 Utah 2d 77, 348 P.2d 679.

7. Sec. 73–1–1, U.C.A.1953; Riordan v. Westwood, 115 Utah 215, 203 P.2d 922.

8. Sec. 73–3–1, U.C.A.1953.

vided, *in times of scarcity,* while priority of appropriation shall give the better right as between those using water for the same purpose, the use for *domestic purposes,* without unnecessary waste, *shall have preference* over use for all other purposes, and use for *agricultural purposes* shall have *preference over use for any other purpose except domestic use.* (Emphasis added.)

■■ The questions as to whether there is a beneficial use and, when the problem becomes pertinent, which use should have preference, can best be determined by the trier of the facts.[9] Under the circumstances shown here, where it appears that the parties had so used the water for a long period of time; that the agricultural use of their lands depended upon it; where they had prepared it with ditches, furrows and dams to make efficient use of the water; and the order specifies that it must be used only when the land is not frozen to assure absorption, we cannot say that the order made is unsupported by the evidence nor that it is unreasonable under the circumstances. Therefore it should not be disturbed.

■ Concerning C., the defendant's complaint that it was improper to require him to install measuring devices in his wells: The evidence is that his South Well, which was to produce 4 c. f. s., actually produced water at the rate of about 5 c. f. s. His North Well, which together with his stock-watering well was to produce 5 c. f. s., produced that amount itself; while the stock-watering well produced an additional 100 to 150 gallons per minute.

It must be realized that underground water basins do not emerge from some mysterious inexhaustible source. They are replenished only from natural precipitation and surface waters. Prudent management of water resources requires that only the average annual recharge be withdrawn. To do otherwise simply results in competitive chasing the water level down by ever deeper wells. Due to the demonstrated interrelationship of the wells in question in this same underground basin, it is necessary that there be close supervision and control of the withdrawal of such waters. This can best be accomplished by the use of the measuring devices ordered placed in defendant White's wells which were sunk after the plaintiffs' rights were established. In such circumstances where either the state eningeer, who is charged with the duty of the administration of water rights in this state,[10] or the District Court in a proper proceeding, finds it necessary in order to protect already established rights, it is

9. See § 73–4–1 et seq., U.C.A.1953; In Re Escalante Valley Drainage Area, 12 Utah 2d 112, 363 P.2d 777; as to advantages of fact trier close to the parties, the witnesses and the controversy see Nokes v. Continental Min. & Mill. Co., 6 Utah 2d 177, 308 P.2d 954.

10. Sec. 73–2–1, U.C.A.1953.

proper that the user be required to install measuring devices.

As to D.: The two parts of the decree challenged on the ground that it is so vague and uncertain that it is invalid are these:

That the town water pipeline have water replaced in it equal to the quantity it would yield or convey with a head of 18 inches above the top of the existing 4 inch line. That said water is in addition to the irrigation water.

That sufficient additional water beyond the one-inch hole placed through the headgate be added to the natural channel to provide livestock water in the fields of all the plaintiffs which abut said channel. That said water shall be in addition to the irrigation and domestic water.

■ The general rule which requires that written instruments be sufficiently clear and definite to be understandable is applicable to a decree of water rights. But this does not necessarily mean that it must set the amount of water with such precision that it can be measured to the quart or gallon.[11] It would be unjust to hold a decree invalid and nullify water rights awarded thereunder simply because the amount of water cannot be determined with that exactitude. The decree is sufficient if the

method of measurement is set forth in practical terms so that persons of ordinary intelligence should understand what their rights and duties are and how to conform to its requirements.[12] The decree describes the manner in which the plaintiffs' water has been taken from the sources mentioned in the past. It limits Fairfield users for domestic purposes to 16 present connections, allows up to 7 more in which rights to connect now exist, and specifies the approximate number of animals that can be watered under the stock-watering rights. It thus meets the test stated above and is therefore not void for being vague and indefinite.

■ Defendant White's final claim of error is that the court failed to make an adjudication of the water rights as between the church cooperative and himself and to require the former, as a junior appropriator, to make a replacement of water depleted from White's wells. Experts who had made hydrological surveys of the area testified that there exists a geologic barrier which separates the underground water basin of the church cooperative wells from that of the Fairfield Springs and the wells belonging to White. It was upon this evidence the trial court found that it has not been shown that the water and pressure in the church cooperative wells is related to Mr. White's wells or to the flow or pressure

---

11. See Larsen v. Madsen, 87 Utah 48, 48 P.2d 429.

12. See discussion in: Sharp v. Whitmore, 51 Utah 14, 168 P. 273; Hardy v. Beaver County Irr. Co., 65 Utah 28, 234 P. 524.

of the Fairfield Springs and refused to so find or to grant a restraining order. This is in conformity with the policy of the law of encouraging and promoting the development and use of water resources and of not interfering therewith unless it is clearly shown that doing so infringes some established prior water right.[13] Nevertheless, due to lack of certainty about the matter the trial court acted wisely in retaining jurisdiction to further consider the possibility of such a relationship after more tests and observations have been made; and if any such relationship is found to exist, to grant appropriate relief.

There is one issue on which the decree is deficient. It appears without dispute that the operation of the church cooperative wells, junior in right to defendant White's stock-watering well, diminished the water in the latter. It follows that upon remand of this case some appropriate adjustment should be made with respect to that situation.

We find no merit in the plaintiffs' cross-appeal against the order dismissing the plaintiffs' claim for punitive damages because the finding that White did not act with malice is supported by the evidence.[14]

The decree should be modified with respect to the interference with defendant White's stock-watering well by the church cooperative wells. In all other respects it is affirmed. The parties bear their own costs.

HENRIOD, C. J., and McDONOUGH and CALLISTER, JJ., concur.

WADE, J., heard the arguments, but died before the opinion was filed.

---

13. Peterson v. Lund, 57 Utah 162, 193 P. 1087.

14. See Powers v. Taylor, 14 Utah 2d 152, 379 P.2d 380; Evans v. Gaisford, 122 Utah 156, 247 P.2d 431.