458 P.2d 861

Louis WAYMAN et al., Plaintiffs and Respondents,

v.

MURRAY CITY CORPORATION, a municipal corporation of the State of Utah; and Wayne D. Criddle, State Engineer of the State of Utah (Hubert C. Lambert, successor to Wayne D. Criddle as State Engineer), Defendants and Appellants.

Kennecott Copper Corporation, Salt Lake City Corporation, and South Milford Well Pumpers Association, Amici Curiae.

No. 11211.

Supreme Court of Utah.

Sept. 17, 1969.

Joseph Novak, Salt Lake City, for Murray City Corporation.

Dallin W. Jensen, Salt Lake City, Asst. Atty. Gen., for State Engineer.

E. J. Skeen, Salt Lake City, for respondents.

CROCKETT, Chief Justice.

In contest here are rights to water, as to amounts and pressure, in an underground water basin, known as the Murray Artesian Basin. It underlies an area in and adjacent to Murray City, lying between the Wasatch Mountains on the east and the Jordan River on the west. Plaintiffs are five families who own residences along Vine Street in Murray. Each has one or more smart wells (1½ to 3 inches in diameter) of varying depths. Each owns established rights to take water by means of their wells approved by the State Engineer. The right of the defendant Murray City derives from its acquisition of seven old wells known as the Baker Wells with rights to use 750 gallons per minute (1.67 c. f. s.) of water from the same underground basin. The rights under some of these wells are prior in time to some of the plaintiffs' wells and later than others. For a period of several years the Baker Wells had not furnished the permitted 750 gallons per minute; and by 1959 the flow had diminished to around 220 gallons per minute. Because of this, Murray City made plans to improve its wells. Pursuant to written permission obtained from the State Engineer on April 10, 1961, it caused a new 16-inch well to be drilled to a depth of 496 feet. It produced an excellent flow, of some variation, up to 1100 gallons per minute. The exact potential of the well is immaterial here because Murray City only contends for its right to draw the 750 gallons of water per minute to which its ownership is not challenged. The Baker

Wells were permanently plugged and sealed and the new well was put into continuous operation in May of 1964; and in that month, the change of diversion from the old wells to the new well was approved by the State Engineer, Wayne D. Criddle, by Change Application A–3887.

Plaintiffs brought this suit in the district court against Murray City and the State Engineer to overturn the latter's decision on the ground that the new well had diminished the flow in their own wells and thus deprived them of their entitled water. Upon a trial the district court found for the plaintiffs and entered a decree directing the State Engineer to incorporate in his approval of Murray's Change Application No. A–3887 the requirement that the City must at its sole cost *permanently* replace to the plaintiffs water in amount and quality equal to the level of their prior use.

On appeal the defendants attack the trial court's judgment and seek reinstatement of the decree of the State Engineer as originally made. They contend (1) that the finding of the trial court that the operation of Murray City's new well re-duced pressures in plaintiffs' wells is unsupported by the evidence; (2) that the court erred in failing to impose proper protective provisions in its replacement order; and (3) that the order to replace waters to plaintiffs deprives Murray City of water belonging to it in violation of Article XI, Section 6 of the Utah Constitution.

Because of the vital importance of water in this arid region both our statutory and decisional law have been fashioned in recognition of the desirability and of the necessity of insuring the highest possible development and of the most continuous beneficial use of all available water with as little waste as possible.[1] Moreover, because underground waters cannot be observed nor measured with precision, but must be determined on the basis of geology, physics and hydrology, there are greater difficulties involved in their allocation and regulation than with respect to surface waters.[2]

There are some facts which are not in dispute. The underground basin involved here still has an abundant supply of water. There flows therefrom into the Jordan

1. Title 73, U.C.A.1953, especially Section 73–1–1: "All waters in this state, whether above or under the ground are hereby declared to be the property of the public." And Sec. 73–1–3: "Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state," and as to case law, e. g., Justesen v. Olsen, 86 Utah 158, 40 P.2d 802; Wrathall v. Johnson, 86 Utah 50, 40 P.2d 755; Riordan v. Westwood, 115 Utah 215, 203 P.2d 922, and American Fork Irr. Co. et al. v. Linke et al., 121 Utah 90, 239 P.2d 188.

2. Spencer v. Bliss, 60 N.M. 16, 287 P.2d 221 (1955); Raphael J. Moses, Basic Groundwater Problems (Fourteenth Annual) Rocky Mountain Mineral Law Institute, 501 at 514.

River drainage more than 34,000 acre feet annually. Inasmuch as there is plenty of water available in the basin, it is apparent that the plaintiffs are not deprived of water as such. What they are deprived of, if anything, is a diminution of pressure in their existing wells to furnish them the water to which they lay claim in the manner they have previously taken it. Also to be considered in the composite picture is the fact that this is not a situation where a party (Murray City) has initiated a *new* withdrawal in a basin which adversely affects the flow of wells prior in time and right.[3] What the City has done is to create a more efficient means of taking the 750 gallons of water per minute from this basin it acquired by its purchase of the Baker Wells. There thus arises the foundational question as to whether a water user, whose well for some reason or another is not producing the water to which he is entitled, may improve his method of taking his entitlement of water from the basin. That in most circumstances this question should be answered in the affirmative is clearly indicated by Sec. 73–3–3, U.C.A.1953, which provides that:

Any person entitled to the use of water *may change the place of diversion* or use and may use the water for other purposes

than those for which it was originally appropriated, * * *.

If we look at the just-quoted portion of the statute by itself there would seem to be no question that it is intended as an affirmative grant of the right to change the diversion in order to put water to the best possible use; nor that such a Change Application should be granted unless there is a showing that it impairs the vested right of another.[4] We are constrained to further remark the apparent soundness of the testimony given by, and the position taken by, the State Engineer that Murray City's taking of 750 gallons per minute from the basin, whether from the Baker Wells, or from the new well, should have the same net effect on the water level of the basin, and not infringe on the plaintiffs' rights, so long as it took no more than that amount of water. Nevertheless, there are other considerations to be reckoned with. The quoted statute, Sec. 73–3–3, further provides: "But no such change shall be made if it impairs any vested right without just compensation." The trial court, upon the trial de novo procedure allowed under Secs. 73–3–14 and 15, found that the new well did adversely affect the flow in the plaintiffs' wells. Inasmuch as there is other substantial evidence in the record to

3. Thus in that respect different from the case of Current Creek Irr. Co. v. Andrews, 9 Utah 2d 324, 344 P.2d 528 (1959).

4. This Court so declared in Salt Lake City v. Boundary Springs Water Users' Ass'n. 2 Utah 2d 141, 270 P.2d 453 (1954).

## 102

support this finding, under traditional rules of review it cannot be disturbed.

■ It was in implementation of its finding that the trial court, as authorized under Sec. 73–3–23, provided that Murray City "must at his sole cost *permanently* replace to the plaintiffs water in amount and quality equal to the level of their prior use." This imposes upon Murray City a sweeping and pervasive responsibility. It seems tantamount to requiring it to insure to the plaintiffs a continuous supply of 100% of their allotted flow henceforward, i. e., we assume, forever. Some questions arise in one's mind. In view of the lack of exact knowledge concerning numerous factors involved in underground water basins, including unpredictable variations in future conditions, such as the annual precipitation and recharge of the basin, the movement of waters in aquifers, the drainage, both above and below ground, and unforeseeable changes in any of the foregoing, how could anyone presage with accuracy that the plaintiffs' wells would have had a 100% continuum of their allotted flow "permanently"? From what we have been able to learn about underground water it seems obvious that any decree so "set in concrete" could prove to be highly inequitable and inconsistent with the objectives of our water law as set forth herein. In order to harmonize with those objectives and to have a realistic application to the rights to the use of water any such decree should be understood as relating to the then existing conditions as shown by the evidence in the particular case, and also should be understood as being subject to change if it is shown that there is any substantial change in such conditions.

It is shown here that all of the wells in question had varied somewhat in their flow and had diminished some over the years. Inasmuch as Murray City's rights (the Baker Wells), were prior in right to some of the plaintiffs', it may have been argued that because Murray City's wells were not producing the 750 gallons per minute they were supposed to, and the plaintiffs' wells were drawing from the same basin, the plaintiffs should be compelled to provide Murray City with its 750 gallons per minute. This, of course, was not done, and correctly so. The observation is made only to point up the fact that attempting to carry out the overriding purpose of our water law, of seeing that all available water is put to beneficial use, and at the same time preserve the rights of individual users to a particular flow of water, presents a problem which is perplexing indeed. Though there is no precise answer, this writer believes that the best approximation of an answer is to be found in recognizing the necessity of analyzing the total situation and the balancing of individual rights in relationship to each other in a reasonable way under the circumstances which will

best serve the above stated overall objective.

If the water table in such an underground basin must be maintained at a sufficiently high level to sustain pressure in the wells in the higher areas, there may be water above and near the surface in the lower areas, forming ponds, marshes, and swamps. This results in wasteful losses from surface evaporation and from consumption by water-loving plants, tules, reeds and rushes, indigenous to such areas, which are of little or no value. There is often further loss by unproductive drainage from the basin. That this is the case here is evident from the fact that there is still the outflow from this basin of more than 34,000 acre feet per year. Under plaintiffs' theory, the other well owners in the basin, of which there are several thousand, could demand tribute from any well owner, such as Murray City, who improved his well, or perhaps even cleaned it, or replaced his worn-out pump or pipe, in order to produce his entitlement to water. There could thus be set up obstacles which would make it impractical or impossible for him to obtain his allotted flow and which would thwart the objective of promoting and encouraging the best and most efficient use of all available water.

 While the problem here under discussion may seem novel, pursued to its fundamentals, it is in essence the same issue that is confronted so frequently in the law: the right of the individual as compared to the rights of the group (the state). Because of our proneness to "identify" with individuals, our first reaction and empathy often leans to the individual. What we sometimes lose sight of is that the rights of the individual could not exist except for the assurance of the group (the state). It is only by the forbearance of individuals in deference to the law, that any peaceable and secure enjoyment of the right to use water is able to exist. Inasmuch as such rights are so assured and protected only by the authority of the state, it is both logical and necessary that the rights of each individual should be to some degree subordinate to and correlated with reasonable conditions and limitations thereon which are established by law for the general good. We believe that reflection will demonstrate that if this principle is applied with wisdom and restraint, in due consideration for the rights of all concerned, it will be seen that the result will much better serve the group (all users and society) by putting to beneficial use the greatest amount of available water, and ultimately also for each individual therein, than would any ruthless insistence upon individual rights which simply results in competitive digging of deeper and deeper wells.[5]

5. E. g., in Southern Arizona wells are drilled to 600 to 700 feet.

From the considerations relating to underground water law hereinabove discussed there has come to be recognized what may be referred to as the "rule of reasonableness" in the allocation of rights in the use of underground water. This involves an analysis of the total situation: the quantity of water available, the average annual recharge in the basin, the existing rights and their priorities. All users are required where necessary to employ reasonable and efficient means in taking their own waters in relation to others to the end that wastage of water is avoided and that the greatest amount of available water is put to beneficial use.

Our neighboring state of Colorado, which has water problems similar to our own, in the case of City of Colorado Springs v. Bender[6] has stated:

> At his own point of diversion on a natural water course, each diverter must establish some reasonable means of effectuating his diversion. He is not entitled to command the whole or a substantial flow of the stream merely to facilitate his taking the fraction of the whole flow to which he is entitled. Schodde v. Twin Falls Land & Water Co., 224 U.S. 107, 119, 32 S.Ct. 470, 56 L.Ed. 686. This principle applied to diversion of underflow or underground water means that *priority of appropriation does not give a right to an inefficient means of diversion,* such as a well which reaches to such a shallow depth into the available water supply that a shortage would occur to such senior even though diversion by others did not deplete the stream below where there would be an adequate supply for the senior's lawful demand.

This view is taken by the eminent authority on water law, Hutchins:[7]

> On the whole, it seems obvious that to accord the first appropriator under a ground-water administrative statute the right to have the water level maintained at the point at which he first pumps it, or damages in lieu thereof, so long as there is an adequate water supply of equivalent quality available at lower depths from which it is feasible to pump, would unduly complicate the administration of water rights in the area and might seriously curtail the fullest utilization of the ground-water supply, for later uses under such a handicap may prove to be economically impracticable. This result would be out of line with the purpose of the statute. Accordingly these factors and implications are worthy of consideration in determining the question of reasonableness of the first ap-

6. 148 Colo. 458, 366 P.2d 552, 555 (1961).

7. Hutchins, Selected Problems in the Law of Water Rights in the West, p. 179.

propriator's diversion under such circumstances.

That an efficient and practical allocation and regulation of underground waters requires a recognition of this principle is further indicated by the fact that several of our western neighbors have in substance codified such a rule.[8]

■ We perceive nothing in our statutory law inconsistent with this "rule of reasonableness" just discussed, nor which compels a conclusion that owners of rights to use underground water have any absolute right to pressure. On the contrary, when our statutes are considered in the light of the policy considerations herein discussed, it seems more in harmony with the major objective of the law to conclude that the means of diversion must be reasonable and consistent with the state of development of water in the area and not

such as to abort the declared purpose of the law of putting all of available water to use.

It is further evident from our statutes on this subject that the legislature, in an awareness of the complexities involved in the regulation and use of underground water, has recognized that it is essential to have the benefit of the expertise of the State Engineer and his staff who are professionally qualified to make such determinations. He is given the duty of general administration and supervision of waters of the State and the measurement, appropriation, apportionment and distribution thereof.[9] Of particular significance and possible usefulness here is Sec. 73-4-14, which enables the district court, in dealing with complexities involved in such problems, when it is found necessary or desirable, to request the assistance of the State Engineer, and imposes the duty on the latter, to investigate and furnish all information which the court deems essential.[10]

8. See Colorado Revised Statutes 1963, Section 148-18-1; Idaho Code, Section 42-226; Kansas, Sections 82a-711 and 711a; Montana, Section 89-2912; Nevada Revised Statutes, Section 534.110; Wyoming Statutes, Section 41-141, and Alaska Statutes, Section 46.15.050.

9. See Chapters 2, 3, 4 and 5 of Title 73, U.C.A.1953.

10. See also Secs. 73-4-11, 73-2-5 and 73-5-1; and Section 73-3-13 provides that where protests are made as to the use of water the State Engineer is authorized to hear, determine and make appropriate

orders with respect thereto; and see Sec. 73-3-23 which deals with the replacement by a junior appropriator (not specifically this case) which states the "replacement shall be at the sole cost and expense of the applicant" but adds, "subject to such rules and regulations as the state engineer may prescribe." Of further interest is Sec. 73-5-1, which provides: "In addition to the power granted the state engineer to appoint water commissioners * * * *the state engineer is hereby authorized upon his own motion at any time to hold a hearing, * * * to determine whether the underground water supply within such area is*

We are sensitive of the desirability of putting an end to such controversies. But a speedy settlement, however otherwise desirable, is not necessarily the best in the long run. What is desirable is the best possible adjustment of the rights of these parties in relationship to each other, and without undue or unreasonable burden upon either, and at the same time serve the desideratum of our water law of putting and keeping to the beneficial use the greatest possible amount of available water. Because it is our judgment that the decree of the district court does not achieve that objective, and because of the importance of the rights, not only of the parties here in contention, but of the policy considerations underlying this proceeding, we feel impelled to remand this case· for further proceedings and settlement of rights in conformity with the principles we have set forth in this opinion.[11] The parties to bear their own costs. (All emphasis added.)

CALLISTER, TUCKETT, HENRIOD and ELLETT, JJ., concur in the result.

adequate for the existing claims. * * * Upon such hearing the state engineer is authorized to make full investigation and findings thereon. If it be found the water supply is inadequate for existing claims, he shall divide, or cause to be divided, by the water commissioner or water commissioners as provided in this section, the waters within such area among the

several claimants entitled thereto in accordance with the rights of each respectively."

11. It is our opinion that Sec. 6 of Art. XI of the Utah Constitution which prohibits a municipal corporation from disposing of its water rights or water system was not intended to apply to an adjudication of water rights in dispute.