*This opinion is subject to revision before final publication in the Pacific Reporter*

**2020 UT 67**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

ROGER B. ARAVE AND KIMBERLY L. ARAVE; JANET SOUTHWICK,
TRUSTEE; VENTURE DEVELOPMENT GROUP, LLC,
*Appellees,*
*v.*
PINEVIEW WEST WATER COMPANY,
*Appellant.*

No. 20180067
Heard November 13, 2018
Filed October 15, 2020

On Direct Appeal

Second District, Ogden
The Honorable Ernie W. Jones
No. 130907544

Attorneys:
John H. Mabey, Jr., David C. Wright, Salt Lake City, for appellees

Edwin C. Barnes, Timothy R. Pack, Emily E. Lewis, Salt Lake City,
for appellants

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE PETERSEN, opinion of the Court:

### INTRODUCTION

¶1 Roger B. and Kimberly L. Arave, Janet Southwick, and the owners of the Snowberry Inn bed-and-breakfast (collectively, Plaintiffs) each have decades-old water rights that allow them to meet their own water needs. They divert their water through the use of two wells. Pineview West Water Company has a much larger, junior water right that allows it to supply water to seventy single-family homes and irrigate over twenty acres of land.

Pineview operates five wells that are much deeper and stronger than those of the Plaintiffs. The Plaintiffs claim that Pineview has interfered with their water rights because when one of Pineview's wells operates (Well 4), it lowers the water table and puts the available water beyond the reach of their pumps. After a bench trial, the district court found in favor of the Plaintiffs on their claims of interference and negligence.

¶2 Pineview appeals, raising the following issues. With regard to the Plaintiffs' interference claims, Pineview asserts the Plaintiffs did not establish interference because they did not prove that they were unable to obtain some amount of their respective water rights and that their means and methods of diversion were reasonable. Pineview asserts that the Plaintiffs' negligence claim should fail because they did not bring it against the proper parties. And finally, Pineview argues that even if the Plaintiffs properly prevailed on their interference and negligence claims, the district court incorrectly calculated damages.

¶3 We reverse the district court's determination that Pineview interfered with the Plaintiffs' wells. We do not disturb the court's ruling on negligence. However, we remand that claim to permit the district court to consider whether it survives the dismissal of the Plaintiffs' interference claims and to make additional findings, if necessary. We vacate a portion of the Plaintiffs' damages award. And we remand the district court's calculation of the remaining damages and imposition of forward-looking remedies for the court to determine if and how they are impacted by the dismissal of the Plaintiffs' interference claims.

## BACKGROUND[1]

*The Parties*

¶4 Roger B. and Kimberly L. Arave are joint owners and residents of a single-family residential property. They own a water right with a priority date of 1963. The Araves' water right allows them to divert 0.45 acre-feet[2] of water annually at a flow

---

[1] "On appeal from a bench trial, we view and recite the evidence in the light most favorable to the [district] court's findings." *Utah State Tax Comm'n v. See's Candies, Inc.*, 2018 UT 57, ¶ 5 n.2, 435 P.3d 147 (citation omitted).

[2] The acre-foot is "the standard unit of measurement of the volume of water," which is "the amount of water upon an acre

(Continued . . .)

rate of 6.7 gallons per minute to supply water for single-family domestic use[3] and two livestock units.

¶5    Janet Southwick, as trustee, is the sole owner and resident of a single-family residential property. She owns a water right with a priority date of 1978. Southwick's water right allows her to divert one acre-foot of water annually to irrigate 0.25 acres of land and supply water for single-family domestic use.

¶6    The Araves and Southwick share the Arave Well as the sole diversion point for their year-round water rights. The Arave Well was drilled in 1963 to a depth of 187 feet with perforations from 140 to 170 feet. The perforations are entirely in an aquifer called the Norwood Tuff.[4]

¶7 Venture Development Group, a limited liability company, is the sole owner of a residential property that operates a commercial bed-and-breakfast known as the Snowberry Inn. It includes nine bedrooms, nine bathrooms, two kitchens, and serves as the year-round residence of the Inn's operator. Venture owns two water rights with priority dates of 1960 and 2017. Venture's original water right allows it to divert 0.45 acre-feet of water annually at a flow rate of 6.7 gallons per minute to supply water for single-family domestic use. However, Venture had been using more water than it had lawfully appropriated, and it was using the water in ways that were not permitted under its original water right. So in 2017, it applied to appropriate additional water. Its new water right, acquired pursuant to a change application,

---

covered one foot deep, equivalent to 43,560 cubic feet." UTAH CODE § 73-1-2.

[3] One domestic unit permits a water right holder to divert 0.45 acre-feet of water to meet the indoor supply needs of five people.

[4] There are two local aquifers relevant to this case: the Norwood Tuff and an area of unconsolidated material that lies on top of it. While the Norwood Tuff is a consolidated bedrock aquifer, the unconsolidated material consists predominantly of sand, gravel, and cobble. The unconsolidated material generally has greater permeability than the Norwood Tuff, meaning that fluid is able to pass through it more easily. But the area of the Norwood Tuff surrounding the three wells is likely fractured, which increases its permeability. The intensity and extent of the fracturing are unknown.

allows Venture to divert an additional 3.25 acre-feet of water for irrigation and commercial use at the Snowberry Inn.

¶8 Venture diverts water year-round from the Snowberry Well, which was drilled in 2001 to a depth of 133 feet. Its perforations are from 105 to 125 feet and span both the Norwood Tuff and the unconsolidated material on top of it. The well likely gets the majority of its water from the more permeable unconsolidated material, but it is hydrologically connected to the Norwood Tuff. The Snowberry Well is equipped with a pump that has the capacity to pump twenty-five gallons per minute. The pump transfers water into a cistern, which then pumps water into the Snowberry Inn. The cistern is equipped with sensors that turn the pump on when the water level inside the cistern drops below a certain point and then signal the pump to turn off when the cistern is full.

¶9 While the Plaintiffs use their water rights to meet their own domestic and business needs, Pineview is a small water company that owns and operates five wells, including the one at issue here—Well 4. Pineview's water rights are almost thirty-three times larger than the Plaintiffs' rights combined,[5] and it supplies water to seventy single-family homes and irrigates over twenty acres of land. But its rights are junior to all of the Plaintiffs' rights except the latest one that Venture acquired. Its earliest right, modified by a change application, has a 2003 priority date. The state engineer's approval stated that modification was "subject to prior rights." In 2013, the state engineer approved a new change application, allowing Pineview to divert additional water. Pineview may divert its water from any combination of the five wells.

¶10 Well 4 is located approximately 700 feet from the Arave Well and approximately 460 feet from the Snowberry Well. It was drilled in 2004 to a depth of 738 feet with four perforated zones from 58 to 98 feet, 208 to 228 feet, 408 to 448 feet, and 648 to 738 feet. Well 4 draws water from both aquifers, but most of its water

_____

[5] Pineview's 2003 water right allows it to divert 90 acre-feet of water annually to irrigate 21.66 acres of land and supply water to fifty-five single-family domestic units. Its 2013 water right allows it to appropriate an additional 78 acre-feet of water annually.

likely comes from the Norwood Tuff. Well 4 is equipped with a pump that has the capacity to pump 100 gallons per minute.

*The Dispute*

¶11 When Well 4 was tested for the first time in 2004, it affected the Arave Well almost immediately. Within hours, the Arave Well was unable to pump any water and began sucking air, resulting in silt damage to the Araves' and Southwick's property. So the test was cut short. The Arave Well recovered within a day or two following that initial test. But a subsequent test produced the same result.

¶12 Nevertheless, Pineview later began regularly pumping Well 4 during irrigation season, from early July until September. When Well 4 was operating, the Arave Well was once again unable to produce water. Eventually, the Snowberry Well had trouble as well. It had traditionally been able to fill its cistern within fifteen minutes. But with Well 4 operating, the Snowberry Well struggled for hours to complete the same task.

¶13 In the beginning, the parties resolved this problem amongst themselves. Pineview agreed to connect the Plaintiffs to its water supply and provide them with culinary water for a flat rate of $20 per month. Once the Araves and Southwick began using Pineview's water, the Araves removed the pump from the Arave Well and no longer used it to obtain water. Instead, they used it as a monitoring well to gather data regarding the impact of Well 4 on the water level.

¶14 Several years later, Pineview sought to increase the Plaintiffs' fees to match those paid by its other water users. The parties tried to reach an agreement regarding new fees, but those negotiations broke down and this suit followed.

¶15 The Plaintiffs sued Pineview, asserting causes of action for interference with water rights, negligence, and nuisance.[6] In their complaint, they sought injunctive relief, damages, and attorney fees.

_____

[6] During the final day of trial, the district court asked whether nuisance was actually a claim in this case. Although the Plaintiffs argued that it was, the court's findings of fact and conclusions of law do not address this claim. And it is not before us on appeal.

*The Final Amended Judgment*

¶16 Following a four-day bench trial during which the district court heard expert testimony from both sides, the court ruled in favor of the Plaintiffs on their interference and negligence claims. In support of the verdict, the district court entered findings of fact and conclusions of law.

¶17 The district court found that neither the Arave Well nor the Snowberry Well had ever experienced difficulty diverting water before Well 4 began pumping. But when Well 4 was in operation, the court found that it created a cone of depression that encompassed both the Arave and Snowberry Wells. The district court explained that a cone of depression is an "underground area of reduced soil saturation [that] is in the shape of an inverted cone, with the point of the cone extending downward toward the point at which the water is extracted. . . . [T]he depth of the water table will be most significantly impacted at the point of extraction . . . ." (Quoting *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 3, 235 P.3d 730.) The actual shape of a cone of depression varies depending on the nature, depth, and permeability of the surrounding aquifer.

¶18 The district court noted that the Arave Well is a "very good surrogate" for Well 4 because it reacts "quickly and accurately" when Well 4 is operating. But the impact on the Snowberry Well is more complex. The district court found that the Arave Well is hydrologically connected to the Snowberry Well. When Well 4 operates, it immediately draws down the water level of the Arave Well. When the elevation of the Arave Well head falls below that of the Snowberry Well, water is drawn away from the Snowberry Well. As a result, the Snowberry Well "struggles to produce even a minimal yield." Recovery time for both wells varies based on several factors.

¶19 The district court concluded that Pineview was liable for interference with the Plaintiffs' water rights and negligence. The court acknowledged that an aquifer's water level is influenced by various factors, including seasonal fluctuations and the amount of water withdrawn by pumping wells. And it found that there had not been a general decline in the groundwater levels where the wells are located.

¶20 But the district court ultimately concluded that pumping Well 4 dewatered the aquifer to such a degree that it temporarily reduced the level of water available to the Plaintiffs' wells. In particular, when Well 4 was pumping, it deprived the Arave Well

of "virtually all water" and obstructed the Snowberry Well's ability to produce water. After determining that the Plaintiffs' means and methods of diverting water were reasonable, the court concluded that Pineview should bear the costs associated with rectifying the interference.

¶21 The district court also found that before expanding its water right in 2017, Venture had used more than its allotted share of water, thereby violating the terms and limitations of its original water right. But the court rejected Pineview's argument that this should bar Venture's ability to prevail on an interference claim. Instead, the district court noted that the state engineer may remedy any such violations by commencing an action under the relevant statutory provision.

¶22 As to negligence, the district court ruled that Pineview was negligent in locating, drilling, and using Well 4 in a manner that interfered with the Arave and Snowberry Wells. According to the court, harm to the Plaintiffs was foreseeable because Well 4 is located near the Plaintiffs' wells, it draws water from the same aquifers that the Plaintiffs use, and it operates at a much larger capacity.

¶23 As a forward-looking remedy, the district court ordered Pineview to stop pumping Well 4 unless and until it could demonstrate that Well 4 could operate without interfering with the Arave and Snowberry Wells. The court retained jurisdiction to determine whether the wells could coexist and to fashion an appropriate remedy based on the outcome of that determination. In the event that interference proved unavoidable, the district court stated that it may order Pineview to provide replacement water to the Plaintiffs at Pineview's sole expense.

¶24 The court also awarded compensatory damages. It ordered Pineview to refund all of the fees that the Plaintiffs had previously paid for water service. It also included the cost of a new pump and associated accessories for the Arave Well as well as costs that Southwick and Venture had incurred due to hard water damage to their property. In sum, the district court awarded $11,503 to the Araves; $5,782 to Southwick; and $28,238 to Venture, along with post-judgment interest at the statutory rate. The Plaintiffs, as prevailing parties, were also entitled to $2,059.96 in costs.

¶25 Pineview appealed. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

**STANDARD OF REVIEW**

¶26 A determination of interference with a water right is a mixed question of law and fact. *See Wayment v. Howard*, 2006 UT 56, ¶ 9, 144 P.3d 1147. When reviewing mixed questions, "we typically grant some level of deference to the district court's application of law to the facts." *Id.* The level of deference afforded varies based on the issue being reviewed. *Searle v. Milburn Irr. Co.*, 2006 UT 16, ¶ 16, 133 P.3d 382. Here, "because the issue of interference is extremely fact dependent, we grant broad deference to the district court." *Wayment*, 2006 UT 56, ¶ 9. The same is true of a determination of negligence. "[A] negligence finding is a classic finding that, while mixed, calls for deference to the lower court." *In re Adoption of Baby B.*, 2012 UT 35, ¶ 43, 308 P.3d 382.

**ANALYSIS**

¶27 Water has been characterized as the "very life blood" of Utah. *Fairfield Irr. Co. v. White*, 416 P.2d 641, 644 (Utah 1966). Recognizing water's importance as a vital resource in our arid state, Utah statutory and case law have been crafted to maintain the flexibility necessary to meet changing circumstances and promote optimal beneficial use of our water supply. *See id.* at 644–45; *see also Wayman v. Murray City Corp.*, 458 P.2d 861, 863–65 (Utah 1969). But our statutory law also protects appropriators of water in order of seniority. *See* UTAH CODE § 73-3-1(5)(a). The balance between protecting senior appropriators and maximizing the beneficial use of water has led to several rules of water law that can sometimes seem to be in tension with one another.

¶28 We begin by identifying those rules. We then explain how they combine to establish the elements of a prima facie case for interference with a water right. Finally, we determine whether the district court's findings sufficiently support its determination of interference.

**I. INTERFERENCE**

¶29 "All waters in this state, whether above or under the ground, are . . . the property of the public, subject to all existing rights to the use thereof." UTAH CODE § 73-1-1(1). A person seeking to acquire the right to use the state's unappropriated waters must apply for and receive approval from the state engineer. *See id.* § 73-3-2(1)(a).

¶30 Appropriators are prioritized according to the dates of their respective water rights. *See id.* § 73-3-21.1(2)(a). In practice,

this means that except in times of a temporary water shortage emergency, "each appropriator is entitled to receive the appropriator's whole supply before any subsequent appropriator has any right." *Id.* § 73-3-21.1(2)(a); *see also id.* § 73-3-1(5)(a) ("Between appropriators, the one first in time is first in rights."); *id.* § 73-3-8(1)(a)(ii) (stating that the state engineer must consider whether the proposed use will impair existing rights when approving an application to appropriate). Generally, a cause of action for interference lies where a junior appropriator's use of water diminishes the quantity or quality of the senior appropriator's existing water right. *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 48, 235 P.3d 730.

¶31 If a junior appropriator interferes with a senior appropriator's water right, the junior appropriator has the right— at his or her own expense—to replace the senior appropriator's water. *Id.* ¶ 63; see also *Fairfield Irr. Co. v. White*, 416 P.2d 641, 645– 46 (Utah 1966) (upholding the district court's order requiring defendant to supply replacement water as being supported by the evidence). This protection also extends to a senior appropriator's "right to continue use of his [or her] existing and historical method of diverting the water." *Wayment v. Howard*, 2006 UT 56, ¶ 13, 144 P.3d 1147.

¶32 When rights clash, however, seniority of rights is not the sole consideration. We have previously recognized that ordering a junior appropriator to supply replacement water in perpetuity is a "sweeping and pervasive responsibility" that "could prove to be highly inequitable and inconsistent with the objectives of our water law." *Wayman v. Murray City Corp.*, 458 P.2d 861, 864 (Utah 1969). The primary objective is ensuring that "the greatest amount of available water is put to beneficial use." *Id.* at 865; *see also* Utah Code § 73-1-3 ("Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."). This objective becomes an important consideration when a junior appropriator's diversion interferes with a senior appropriator's water right. *See Wayman*, 458 P.2d at 864–67.

¶33 In *Wayman*, we adopted the "rule of reasonableness," which allows courts to balance competing rights in a manner that best achieves the goal of putting the greatest amount of water to beneficial use. *Id.* at 865–67. Under the rule of reasonableness, "[a]ll users are required where necessary to employ reasonable and efficient means in taking their own waters in relation to others to the end that wastage of water is avoided and that the

greatest amount of available water is put to beneficial use." *Id.* at 865. This rule tempers the prior appropriation doctrine, which could otherwise allow a senior appropriator to hold unappropriated water hostage due to outdated and inefficient methods of diversion. *Id.* at 865–66. In assessing reasonableness, courts should consider the total situation, including "the quantity of water available, the average annual recharge in the basin, the existing rights and their priorities." *Id.* at 865.

¶34 Protecting senior water rights and maximizing the beneficial use of available water both have a place in our law. But these concepts do not always easily coexist. We take this opportunity to clarify the specific elements of a claim of interference with a water right. In doing so, we do not depart from prior case law; instead, we seek to synthesize it by explaining how the governing concepts should come together to establish a prima facie case of interference.

¶35 To prevail on an interference claim, we clarify that plaintiffs must establish that: (1) they have an enforceable water right,[7] (2) their water right is senior to the defendant's water right,[8] (3) their methods and means of diversion are reasonable,[9] (4) despite their reasonable efforts, they are unable to obtain the quantity or quality of water to which they are entitled,[10] and (5) the defendant's conduct obstructed or hindered their ability to obtain that water (causation).[11]

¶36 The district court found that Pineview interfered with both the Arave and Snowberry Wells when it operated Well 4. Pineview argues that the district court erred in multiple ways.

---

[7] *See Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶¶ 48, 53, 235 P.3d 730.

[8] *See* UTAH CODE §§ 73-3-1(5)(a), -21.1(2)(a).

[9] This element is based upon the rule of reasonableness, which requires that each appropriator's "means of diversion must be reasonable and consistent with the state of development of water in the area." *Wayman v. Murray City Corp.*, 458 P.2d 861, 866 (Utah 1969).

[10] *See* UTAH CODE § 73-3-23; *see also Wayment v. Howard*, 2006 UT 56, ¶ 13, 144 P.3d 1147.

[11] *See* UTAH CODE § 73-3-23; *see also Bingham*, 2010 UT 37, ¶ 48.

First, it argues that none of the Plaintiffs established interference because they offered no evidence showing they were unable to get some quantity of their respective water rights. Second, Pineview argues that the district court erred in concluding the Plaintiffs' means of obtaining their water was reasonable. And finally, Pineview argues that the district court's damages assessment was wrong. We address the Arave Well and then the Snowberry Well, applying the prima facie case outlined above.

*A. Arave Well*

¶37 The district court correctly found that the Araves and Southwick[12] satisfied the first, second, and fifth elements of an interference claim: specifically, that the Plaintiffs possess enforceable water rights, those rights are senior to Pineview's water rights, and Pineview's pumping of Well 4 hindered the Plaintiffs' ability to get their water because it dropped the water table below the level of the Arave Well's pump. However, the court made insufficient findings to establish that the Plaintiffs' method and means of diversion were reasonable (the third element). Consequently, the court could not properly conclude that despite reasonable efforts, the Plaintiffs were unable to obtain some quantity of their water rights (the fourth element). For these reasons, we reverse the district court's interference determination.

¶38 With regard to the first element of an interference claim, Pineview does not dispute that the Araves and Southwick possess lawfully appropriated water rights. However, Pineview contends that the district court essentially granted the Plaintiffs a right to a certain level of the water table, to which they have no enforceable right. Pineview correctly characterizes the district court's conclusions. The court ruled that:

> [Pineview's] interference consists of dewatering the aquifers that are the source of supply for the Arave and [Snowberry] wells, thus obstructing and hindering the quantity of water available to the Arave and [Snowberry] wells, first by depriving the Arave well of virtually all water, and by obstructing the [Snowberry] well's ability to produce water.

---

[12] In this section of the opinion addressing only the Arave Well, when we refer to the "Plaintiffs," we mean Arave and Southwick.

¶39 Pineview relies on our decision in *Bingham v. Roosevelt City Corporation*, for its contention that the Plaintiffs have no enforceable right to the level of the water table. *See* 2010 UT 37, ¶ 12. In *Bingham*, the plaintiffs sued the city, alleging that its manner of diverting water had reduced the level of soil saturation beneath the plaintiffs' properties, thereby impairing their ability to raise crops and livestock. *Id.* ¶¶ 1, 5–6. Significantly, the plaintiffs had not appropriated the water in the soil. *Id.* ¶¶ 29, 36. Nevertheless, they argued that the level of soil saturation was a component of the water rights that they had appropriated because it allowed them to use the appropriated water more beneficially. *Id.* ¶¶ 20, 25. In other words, the plaintiffs required less water to irrigate their land before the city's diversion had lowered the water table. *Id.* ¶ 20. We affirmed the district court's grant of summary judgment in favor of the city, reasoning that beneficial use of water does not substitute for appropriation. *Id.* ¶¶ 29–30. Thus, because the plaintiffs had not appropriated the water in their soil, they did not have an enforceable right to its continued presence. *Id.* We also explained that the plaintiffs had sustained no compensable injury because they were still able to access all of the water to which they were entitled under their water rights. *Id.* ¶¶ 49–50.

¶40 The circumstances here are different than those in *Bingham.* Here, the Plaintiffs each have lawfully appropriated water rights, allowing them to divert water from their respective wells. They are not claiming an enforceable right to use additional unappropriated water simply because it is present in their soil. *Cf. id.* ¶ 24. Instead, they seek to enforce their existing senior water rights. And although we held in *Bingham* that the plaintiffs had no enforceable right to the water in their soil, we recognized that "a claim of interference can be sustained where a junior appropriator lowers the water table in a manner that hinders the diversion of water by a senior appropriator." *Id.* ¶ 51.

¶41 We conclude that the Plaintiffs have satisfied this element of an interference claim because they have lawfully appropriated water rights. But we clarify that the Plaintiffs have an enforceable right only in these lawfully appropriated water rights—not in a particular level of the water table. The Plaintiffs' claim that Pineview's dewatering of the aquifer constitutes actionable interference cannot be divorced from the requirement that the Plaintiffs make reasonable efforts to obtain their water. Fundamentally, the Plaintiffs must show that because of the actions of Pineview, they can no longer access the water to which

they are entitled even though they have made reasonable efforts to do so. If they cannot make such a showing, they have demonstrated only that Pineview has lowered the water table, not that it has prevented them from obtaining some quantifiable portion of their water right.

¶42 With regard to the second element, it is undisputed that the Araves' and Southwick's water rights are senior to Pineview's.

¶43 However, with regard to the third element, we conclude that the district court did not find sufficient facts to establish that the Plaintiffs' method and means of diversion were reasonable. This element is based upon the rule of reasonableness, which requires that each appropriator's "means of diversion must be reasonable and consistent with the state of development of water in the area." *Wayman*, 458 P.2d at 866. The rule of reasonableness permits the factfinder a measure of flexibility in considering the totality of relevant facts—such as the quantity of water available, the average annual recharge, the existing rights that are in conflict, and their relative priorities—with the objective of putting the greatest amount of water to beneficial use. *Id.* at 865. As we explained in *Wayman*, all water users are required to "employ reasonable and efficient means in taking their own waters in relation to others to the end that wastage of water is avoided and that the greatest amount of available water is put to beneficial use." *Id.*

¶44 Here, the district court concluded, the "Plaintiffs' means and method of diverting their water are reasonable. Their wells are the only possible method for diverting the water under their rights. Those wells functioned without problem until [Well 4] was drilled."

¶45 These findings are not sufficient to establish that the operation of the Arave Well was reasonable during the relevant time period. The district court appears to have based its conclusion on two findings: first that the Araves can divert their water only through the use of the well based on the terms of their water right, and second that the well functioned without issue until Well 4 began to operate. Those facts are certainly relevant to the reasonableness question, but they do not complete the analysis. It is also necessary to consider whether the Araves were operating the well efficiently and consistent with the current state of development in the area, and to identify and consider any other factors relevant to maximizing the beneficial use of water.

¶46 Here, the record evidence established that although the water table dropped when Well 4 pumped, "there ha[d] not been a general decline in groundwater levels in the regional basin in which [the] aquifers are located," although it fluctuated seasonally. Under these circumstances, it was necessary to determine whether the Plaintiffs made reasonable efforts to obtain the available water but were unable to do so. However, the court did not make findings related to whether the Plaintiffs could have lowered their pump or otherwise modified the well to reach the available water, or conversely, explain why this would have been futile or otherwise not possible.[13] Without this, there are not adequate findings to establish that the Plaintiffs made reasonable efforts to obtain their water.

¶47 While the Plaintiffs' failure to meet the requirements of the third element is dispositive, we note that the third and fourth elements are closely related. If the Plaintiffs cannot demonstrate that their means and method of diversion are reasonable, it is impossible to satisfy the fourth element of the prima facie case—that despite reasonable efforts, the Plaintiffs could not obtain the quantity of water to which they were entitled.

¶48 We note an additional problem with the Plaintiffs' proof on the fourth element. The district court did not make findings about the specific amount of their respective water rights that the Araves and Southwick were unable to obtain. Rather, the court found that Pineview's operation of Well 4 interfered with the Plaintiffs' well. But this does not necessarily establish that the Plaintiffs were unable to obtain some quantity of their water right.

¶49 The Plaintiffs did not offer evidence of how much water they used or how much of their appropriated water they were not able to obtain. This is because the Araves did not have a metering device in their well. We do not mean to suggest that it was

_____

[13] Rather, the court found that the Araves removed the pump and used the well as a monitoring well to document the impact of pumping Well 4. The court accepted the Plaintiffs' explanation that if they had pumped the well at the same time, it would have been more difficult to interpret the data. While this may be the case, it does not excuse the Araves from showing that at some point after the alleged interference, they made reasonable efforts to reach available water but were unable to do so.

impossible for Plaintiffs to show interference by proving that Pineview interfered with the year-round nature of their water rights. But it is difficult for them to establish that Pineview prevented them from obtaining some quantifiable amount of the water to which they were entitled with no measurements of the amount of water they *could* obtain at the time of the alleged interference.

¶50 In sum, we conclude there are insufficient findings to establish that the Plaintiffs' means of diversion was reasonable and that despite their reasonable efforts the Plaintiffs were unable to obtain some quantity of their water rights. Accordingly, we reverse the district court's ruling that Pineview interfered with the Arave Well.

*B. Snowberry Well*

¶51 With regard to the Snowberry Well, Pineview argues that because Venture exceeded the terms and limits of its senior water right,[14] it cannot make a viable interference claim. In other words, Pineview asserts that Venture's water use was illegal, and any alleged interference with an illegal use is not actionable. Pineview further argues that Venture did not prove it was unable to obtain the water to which it was entitled under its original, senior water right. We reject the first argument, but we agree that the district court did not make sufficient findings to establish that Pineview could not obtain some portion of its senior water right.

¶52 Pineview argues that Venture's excessive water use is fatal to its interference claim. This relates to the first element of the prima facie case. Pineview essentially argues that Venture's violation of its water right renders it unenforceable. We reject this argument. While excessive use may make it more difficult for Venture to prove that it could not obtain the water allotted to it under its 1960 right and that its diversion was reasonable, Venture has not lost its water right. Certainly, it risked an enforcement action by the state engineer. *See* UTAH CODE § 73-2-25(2)(a). But if Venture can make out a claim for interference, its excessive use would not bar such an action or shield Pineview from liability.

---

[14] Venture not only used more water than it was allotted, but used it to support a commercial bed-and-breakfast and to irrigate when it was entitled to use its water only for domestic purposes.

¶53 However, we agree with Pineview that Venture has not proven interference. With regard to the first element, it is undisputed that Venture has an enforceable 1960 water right that allows it to divert 0.45 acre-feet of water at a flow rate of 6.7 gallons per minute from the Snowberry Well for single-family domestic use.

¶54 Second, this water right is senior to both of Pineview's water rights. Because Venture exceeded the limits and terms of this senior water right, it obtained an additional water right from the state engineer. The new 2017 water right is junior to Pineview's rights and is not part of Venture's interference claim.

¶55 Third, with regard to reasonableness, the district court made the same finding for both wells. As described above, the court concluded that the "Plaintiffs' means and method of diverting their water are reasonable. Their wells are the only possible method for diverting the water under their rights. Those wells functioned without problem until [Well 4] was drilled." For the reasons we explained above, this is insufficient to establish that the Snowberry Well was a reasonable means of diversion in the manner in which Venture operated it. *See supra* ¶¶ 43–45.

¶56 This impacts Venture's ability to satisfy the fourth element. As we have explained, without a sufficient finding of reasonableness, Venture cannot show that despite reasonable efforts it was unable to obtain its water. *See supra* ¶¶ 46–48.

¶57 And while this is determinative, we also note that the district court's findings regarding Venture's inability to obtain some measure of its water right were insufficient. While the district court found that Well 4 hindered the Snowberry Well's ability to produce water, it did not specifically find that Venture was unable to obtain the quantity of water to which it was entitled under its senior water right. The findings state only that the Snowberry Well "struggles" when Well 4 operates. So we do not know whether Venture was ultimately unable to obtain some portion of the 0.45 acre-feet of water allotted to it under its 1960 right. This is especially problematic where Venture used more than its allotted right.

¶58 Accordingly, we reverse the district court's determination that Pineview interfered with the Snowberry Well.

## II. NEGLIGENCE

¶59 Pineview next contends that the district court erred in concluding it was negligent in locating, drilling, and using Well 4.

The district court concluded Well 4 operates in a manner that interferes with the Arave and Snowberry Wells and that such harm was foreseeable due to Well 4's close proximity to the Plaintiffs' wells, its use of the Plaintiffs' water source, and its larger capacity.

¶60 First, Pineview argues that this ruling is erroneous because it was not Pineview but other developers who sited, drilled, and tested Well 4 and the Plaintiffs did not join those developers in this case. But even assuming Pineview did not site or drill Well 4, it does currently own and operate the well. And Pineview provides no argument or authority as to why the current operator of a well should be insulated from liability for negligence because it did not originally site and drill the well. Likewise, Pineview does not provide any legal argument or authority as to why not joining the prior developers is fatal to the Plaintiffs' negligence claim against Pineview.

¶61 Pineview also asserts that the Plaintiffs' negligence claim fails because they did not offer expert testimony establishing the relevant standard of care and causation. But Pineview has not explained why the Plaintiffs were obligated to present expert testimony to establish causation or the standard of care in this case. Pineview cites *Ladd v. Bowers Trucking, Inc.* to assert that "Utah courts generally require expert testimony to prove causation in tort cases in all but the 'most obvious cases.'" 2011 UT App 355, ¶ 10, 264 P.3d 752 (citation omitted). While that language was accurate in context—proving causation of medical injuries—we have also explained that "[q]uestions of ordinary negligence are properly determined by the lay juror without the need for expert testimony." *Graves v. N. E. Servs., Inc.*, 2015 UT 28, ¶ 40, 345 P.3d 619. Expert testimony is necessary only for "issues that do not fall within the common knowledge and experience of lay jurors." *Callister v. Snowbird Corp.*, 2014 UT App 243, ¶ 19, 337 P.3d 1044. Yet Pineview has failed to specify which matters are beyond the capacity of the factfinder in this case.

¶62 By failing to adequately analyze or argue either point, Pineview has failed to meet its burden of persuasion and has shifted the burden of research and argument to this court. *See Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904. Under rule 24(a)(8) of the Utah Rules of Appellate Procedure, an appellant's argument "must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." This briefing

requirement is "a natural extension of an appellant's burden of persuasion." *Living Rivers v. Exec. Dir. of the Utah Dep't of Env't. Quality*, 2017 UT 64, ¶ 33, 417 P.3d 57 (citation omitted). Thus, "[a]n appellant who fails to adequately brief an issue will almost certainly fail to carry its burden of persuasion on appeal." *Id.* (citation omitted) (internal quotation marks omitted).

¶63 Accordingly, we decline to reverse the district court's negligence ruling. However, in light of our reversal of the district court's interference determinations, we remand this claim for reconsideration and further factfinding, if necessary. This is because the district court's negligence determination flows from its finding of interference. The district court concluded that Pineview had breached a duty of care to the Plaintiffs when it "located, drilled, and used [Well 4] in a manner that *interferes with plaintiffs' wells*." (Emphasis added.) It is not clear how our reversal of the Plaintiffs' interference claims impacts the district court's negligence ruling. Accordingly, we remand for the district court to consider that question and make any additional findings of fact that it deems necessary.

## III. DAMAGES

¶64 We also remand to the district court its calculation of damages and imposition of prospective remedies. The court should determine whether these are altered by the reversal of its interference determinations. Any damages now stem only from the Plaintiffs' negligence claim.

¶65 Additionally, we vacate a portion of the court's compensatory damages award. Pineview argues the damages award is excessive to the extent the district court required Pineview to refund water service fees paid by the Plaintiffs for periods when Well 4 was inactive and therefore did not impact the Plaintiffs' ability to obtain water. We agree. The evidence presented at trial established that Well 4 pumped only seasonally and the Plaintiffs' wells recovered within a day or two after Well 4 ceased pumping. In assessing the damages caused by Pineview's negligence, the court should award damages only for fees paid during the period of the year that Well 4 injured the Plaintiffs' use of their wells. Accordingly, we vacate the portion of the damages award that compensates the Plaintiffs for fees paid during periods in which their wells would have been unimpeded by Well 4 if they had attempted to use them.

## IV. ATTORNEY FEES

¶66 Pineview requests attorney fees under Utah Code sections 73-2-28(4) and 78B-5-825. Because we affirm the district court's judgment that Pineview was negligent, we conclude that Pineview is not entitled to attorney fees on appeal.

## CONCLUSION

¶67 We reverse the district court's determination of interference regarding the Arave and Snowberry Wells. In light of this, we remand the court's determination of negligence for reconsideration and further factfinding, as the court deems necessary. We vacate the damages award to the extent that it compensates the Plaintiffs for fees paid during periods of the year when Pineview did not utilize Well 4. And finally, we remand to the district court to determine whether to revisit its damages award and imposition of remedies in light of the reversal of its interference determinations.